162 P.3d 696 (2007)
George KAHO`OHANOHANO, Loren Andrade, State of Hawai`i Organization of Police Officers (SHOPO), Pauline Efhan, and Norma Caravalho, Plaintiffs-Appellants/Cross-Appellees and
Jackie Ferguson-Miyamoto, Henry F. Beerman, Odetta Fujimori, Darwin J. Hamamoto, Pilialoha E. Lee Loy, Alton Kuioka, Colbert M. Matsumoto, and Georgina Kawamura in their official capacities as Trustees of the Employees' Retirement System of the State of Hawai`i and not in their individual capacities,[1] Intervenor Plaintiffs-Appellants/Cross-Appellees
v.
STATE of Hawai`i, Defendant-Appellee/Cross-Appellee/Cross-Appellant and
City and County of Honolulu, Intervenor Defendant-Appellee/Cross-Appellant/Cross-Appellee and
County of Kaua`i, County of Maui, and County of Hawai`i, Additional Defendants-Appellees/Cross-Appellees/Cross-Appellants.
No. 26178.
Supreme Court of Hawai`i.
July 23, 2007.
*703 Mark S. Davis and Michael Livingston (Davis Levin Livingston Grande); Peter Gruenstein (pro hac vice) (Gruenstein & Hickey); Peter J. Maassen (pro hac vice) (Ingaldson Maasen, P.C.); and Will Aitchison (pro hac vice) (Aitchison & Vick, Inc.) for Plaintiffs-Appellants/Cross-Appellees.
Robert Bruce Graham, Jr. and James K. Mee (Ashford & Wriston) for Intervenor Plaintiffs-Appellants/Cross-Appellees.
*704 Clyde W.M Matsui and Archie T. Ikehara (Matsui Chung Sumida & Tsuchiyama) for Defendant-Appellee/Cross-Appellee/Cross-Appellant State of Hawai`i.
Paul A. Schraff, Special Deputy Corporation Counsel (Dwyer Schraff Meyer Jossem & Bushnell) for Intervenor Defendant-Appellee/Cross-Appellant/Cross-Appellee City and County of Honolulu.
Margaret Hanson, Deputy County Attorney, County of Kaua`i for Additional Defendant-Appellee/Cross-Appellee/Cross-Appellant County of Kaua`i.
Cheryl Tipton, Deputy Corporation Counsel, County of Maui for Additional Defendant-Appellee/Cross-Appellee/Cross-Appellant County of Maui.
Katherine A. Garson and Joseph K. Kamelamela, Deputies Corporation Counsel, County of Hawai`i, for Additional Defendant-Appellee/Cross-Appellee/Cross-Appellant County of Hawai`i.
NAKAYAMA, ACOBA, JJ., and Circuit Judge TOWN, in place of DUFFY, J., Recused; and MOON, C.J., Dissenting, with whom LEVINSON, J., joins.
Opinion of the Court by ACOBA, J.
We hold, in this appeal by Plaintiffs-Appellants/Cross-Appellees George Kaho`ohanohano (Kaho`ohanohano), Loren Andrade (Andrade), Pauline Efhan (Efhan), Norma Caravalho (Caravalho), and the State of Hawai`i Organization of Police Officers (SHOPO) [collectively, Plaintiffs] and Intervenor Plaintiffs-Appellants/Cross-Appellees Jackie Ferguson-Miyamoto, Henry F. Beerman, Odetta Fujimori, Darwin J. Hamamoto, Pilialoha E. Lee Loy, Alton Kuioka, Colbert M. Matsumoto, and Georgina Kawamura, in their official capacities as Trustees of the Employees' Retirement System of the State of Hawai`i (ERS) [collectively, Trustees], from the June 24, 2003 judgment of the first circuit court (the court)[2] in favor of Defendant-Appellee/Cross-Appellee/Cross-Appellant State of Hawai`i (the State) and against Plaintiffs and Trustees, that (1) Plaintiffs lack standing to seek declaratory and injunctive relief, and damages, regarding Act 100 of the 1999 Hawai`i legislative session, see 1999 Haw. Sess. L. Act 100, § 1 at 368 [hereinafter, Act 100], as codified under Hawai`i Revised Statutes (HRS) § 88-107 (Supp.2006), (2) Trustees have standing to seek declaratory and injunctive relief from the court regarding Act 100, (3) the arguments raised by the State as to Trustees concerning ripeness, mootness, the political question doctrine, sovereign immunity, and the statute of limitations are unpersuasive, (4) Act 100 violates article XVI, section 2 of the Hawai`i Constitution[3] which prohibits the impairment of accrued benefits of ERS members, inasmuch as (a) the Proceedings of the 1950 Constitutional Convention of Hawai`i indicate that, article XVI, section 2 was intended to ensure that the State and local governments provide a sound retirement system for their employees; (b) the proceedings sought to confirm that the retirement system would fulfill its obligations into the future; (c) necessarily implied in article XVI, section 2 prohibiting impairment of accrued benefits is the protection of the sources for those benefits; (d) Act 100 retroactively divested the ERS of $346.9 million of employer contributions for 1997, 1998, and 1999, thereby eliminating the sources used to fund constitutionally protected "accrued benefits"; and (e) Act 100 undermined the retirement system's continuing security and integrity; (5) article XVI, section 2 of the Hawai`i Constitution is patterned after the New York system, and New York case law similarly requires that the sources of ERS benefits be protected; and (6) other relevant jurisdictions hold similarly. Plaintiffs also challenge the court's June 24, 2003 order granting summary judgment in favor of the State and denying Plaintiffs' two motions for partial summary judgment that were filed on October 1, 2002.
Accordingly, as to Plaintiffs, the court's June 24, 2003 final judgment entered in favor *705 of the State and against the Plaintiffs is remanded to the court with instructions to enter an order dismissing the Plaintiffs' claim for lack of jurisdiction.
As to Trustees, we vacate the court's June 24, 2003 judgment and remand this matter to the court. The court is instructed to enter summary judgment against the State and in favor of Trustees on Trustees' declaratory judgment claim that Act 100 violated article XVI, section 2 of the Hawai`i Constitution. See Univ. of Hawai`i v. City & County of Honolulu, 102 Hawai`i 440, 443-44, 77 P.3d 478, 481-82 (2003) ("`[A] court may enter judgment for the non-moving party on a motion for summary judgment where there is no genuine issue of material fact and the non-moving party is entitled to judgment as a matter of law.'" (Quoting Konno v. County of Hawai`i, 85 Hawai`i 61, 76, 937 P.2d 397, 412 (1997) (Brackets in original.) (Other citation omitted.))). We remand to the court Trustees' other claims for declaratory relief raised in Trustees' Complaint in Intervention (complaint) for disposition as appropriate. The injunctive relief sought by Trustees shall not issue under the circumstances of this case, inasmuch as "the prospective injunctive relief requested by [Trustees] would not appear to be necessary in view of our explication of the applicable law[.]" Rees v. Carlisle, 113 Hawai`i 446, 459, 153 P.3d 1131, 1144 (2007).

I.
The ERS provides retirement benefits to State and county employees, who become members upon their entry or reentry into service of the State or any county. HRS §§ 88-22 (1993), 88-42 (1993). Chapter 88 of the HRS governs the operation of the ERS and vests "general administration and the responsibility for the proper operation" in Trustees. HRS § 88-23 (Supp.2002). The system is funded by contributions from State and county employers, as well as State and county employees. See e.g., HRS §§ 88-45 (Supp.2006), 88-122 (Supp.2006), 88-123 (Supp.2002),[4] 88-125 (Supp.2002). Pursuant to HRS § 88-127 (1993), Trustees must hold the ERS funds "in trust . . . for the exclusive use and benefit of the system and for the members of the system" and those funds "shall not be subject to appropriation for any other purpose whatsoever." (Emphasis added.) "The assets of the system are assigned to . . . (1) [t]he annuity savings fund; (2) [t]he pension accumulation fund;[[5]] and (3) [t]he expense fund." HRS § 88-109 (Supp. 2006).
"Pursuant to HRS § 88-22, the ERS possesses the full `powers and privileges of a corporation . . . and by [its] name may sue or be sued, transact all of its business, invest all of its funds, and hold all of its cash and securities and other property.'" Chun v. Bd. of Trs. of Employees' Ret. Sys. of the State of Hawaii, 87 Hawai`i 152, 162-63, 952 P.2d 1215, 1225-26 (1998) (citation omitted) (emphasis added). This court has further explained that "pursuant to HRS § 88-23, `[t]he general administration and the responsibility for the proper operation of the [ERS] . . . are vested in [Trustees]; subject . . . to the area of administrative control vested in the department of budget and finance by HRS §§ 26-8 [ (Supp.2002) ] and 26-35 [ (1993) ]." Id. at 163, 952 P.2d at 1226 (footnotes omitted) (some brackets in original and some added). In that regard then this court has described the powers and duties of Trustees as "functionally equivalent to those of the board of directors of a private corporation and are limited only by `the area[s] of administrative control' reserved to the department of budget and finance by HRS §§ 26-8 and 26-35." Id. (quoting HRS § 88-23).[6]
*706 Pursuant to HRS chapter 88, Trustees owe a fiduciary duty to the retirement system itself, as well as to members of the system. Honda ex rel. Kamakana v. Bd. of Trs. of the Employees' Ret. Sys., 108 Hawai`i 338, 344, 120 P.3d 237, 243 (2005) (hereinafter, Honda II). In Honda II, Trustees' fiduciary duties were described in the following manner:
HRS § 88-22 (1993), the statute establishing the ERS, provides that the retirement system "shall have the powers and privileges of a corporation." (Emphasis added.) It is axiomatic that a corporation's directors and officers assume fiduciary duties. See Chambrella v. Rutledge, 69 Haw. 271, 274, 740 P.2d 1008, 1010 (1987) (finding that plaintiffs-union members should not be precluded from equitable relief in an action against defendant nonprofit corporation for breach of fiduciary duties); Hawaiian Int'l Fin. v. Pablo, 53 Haw. 149, 153, 488 P.2d 1172, 1175 (1971) ("It is a well established rule both in Hawaii and in a majority of the [s]tates that the relation of directors to the corporations they represent is a fiduciary one."); Lum v. Kwong, 39 Haw. 532, 538 (1952) ("The relation of directors to corporations is a fiduciary one and the well-established rule both in Hawaii and in a majority of the [s]tates is that when fiduciaries deal with themselves relative to their trust property the burden is upon such fiduciaries to establish the fairness of the transaction."); Bolte v. Bellina, 15 Haw. 151, 153-54 (1903) ("Directors stand towards the corporation which they represent and act for in the relation of trustees to a cestui que trust. . . . They must act in good faith and for the interests of the stockholders whom they represent."); Lussier v. Mau-Van Dev., Inc., 4 Haw.App. 359, 381, 667 P.2d 804, 819 (1983) ("A corporate director or officer occupies a fiduciary capacity." (Internal quotation marks, brackets, and citations omitted.)). See also HRS §§ 414-221, -233 (1993) (delineating standards of conduct for corporate directors and officers).
. . . HRS § 88-23, which creates the ERS Board, vests the "general administration and the responsibility for the proper operation of the retirement system and for making effective the provisions of this part and part VII of this chapter . . . in a board of trustees[.]" (Emphasis added.) Trustees, by definition, are imbued with fiduciary duties. See Black's Law Dictionary 1514 (6th ed.1990) (defining "trustee" as "[o]ne who holds legal title to property `in trust' for the benefit of another person (beneficiary) and who must carry out specific duties with regard to the property). The trustee owes a fiduciary duty to the beneficiary." (Citing Reinecke v. Smith, 289 U.S. 172, 53 S.Ct. 570, 77 L.Ed. 1109 (1933))[.]
Id. at 343, 120 P.3d at 242 (emphases added).
Under HRS chapter 88, Trustees engage an actuary to determine the employers' normal cost and accrued liability contributions for each fiscal year. HRS §§ 88-122, 88-123. Trustees are responsible for calculating the annual contributions that the State and counties must pay into the ERS pursuant to HRS §§ 88-122 and -123. Trustees are to certify those amounts to the governor and the county councils, who must then include those amounts in their annual budgets. HRS §§ 88-124 (1993), 88-126 (Supp.2002). Trustees must also allocate the ERS' earned *707 interest in accordance with HRS § 88-107 (Supp.2006).

II.
The State has historically mandated that Trustees apply earnings of the ERS funds in excess of a specified investment yield rate of eight percent to offset the employer contributions of the State and counties. See HRS §§ 88-107, 88-122, 88-127. This offset was coupled with a requirement that government employers pay any additional amount needed to meet the specified yield rate if earnings were not sufficient to meet the rate in a particular year. See 1925 Haw. Sess. L. Act. 55, § 7 at 63. Trustees state that "[i]n other words, excess investment earnings in `peak' years might [have been] used to offset future employer contributions if investment earning shortfalls in `valley' years were made up by the government employers." Trustees refer to this practice of taking the "peaks," also known as, earnings in excess of specified yield rates, as "skimming." As set forth in Trustees' complaint, "When the earnings of high-return years are skimmed, . . . the ERS loses the benefit of high yields that would offset market cycles in low-return years and is denied the benefit of full, ongoing [e]mployer funding."
In 1994, the legislature altered this practice to address the rising level of unfunded ERS obligations. It amended HRS § 88-107 (1993) to require that the excess earnings be applied to the pension accumulation fund[7] in increasing amounts, rather than be credited against employer contributions. 1994 Haw. Sess. L. Act 276, § 6 at 863. The legislation provided that, after ten years, one hundred percent of any excess earnings be "allocated and deposited in the pension accumulation fund." Id. Act 276 of the 1994 legislative session added, in part, the following language to HRS § 88-107:
Beginning with actual investment earnings in fiscal year 1995 in excess of the investment yield rate, to address outstanding unfunded pension obligations, ten per cent of such excess earnings shall be deposited in the pension accumulation fund; remaining excess earnings shall be applied to the amounts to be contributed under section 88-123. In each succeeding fiscal year, another ten per cent, cumulatively up to one hundred per cent, of any excess such earnings shall be similarly allocated and deposited in the pension accumulation fund.

Id. (emphases added). The Ways and Means Committee explained that the intent of the Committee was "to liquidate the unfunded benefit obligations by the year 2003 and then begin to use the moneys in the pension accumulation fund to provide benefits exclusively for ERS beneficiaries." Stand. Comm. Rep. No. 2948, in 1994 Senate Journal, at 1171.
For fiscal year 1995, ERS investment yields were significantly below the statutory investment yield rate, and, thus, the ERS faced a shortfall of $99.4 million, which the State and counties were obligated to make up in fiscal year 1997. See Stand. Comm. Rep. No. 486, in 1997 Senate Journal, at 1092. Despite this, the legislature further amended HRS § 88-107 in 1997 and eliminated the obligation of the State and counties to make up any future shortfalls in investment yields. See Stand. Comm. Rep. No. 835, in 1997 Senate Journal, at 1223.
However, Act 327, 1997 Haw. Sess. L. Act. 327, § 2 at 774 [hereinafter, Act 327], allowed the ERS to retain one hundred percent of its investment earnings beginning in fiscal year 1997, and accelerated the ten-year time frame within which the ERS would be allowed to retain all of its investment earnings:
Your Committee believes that it is incumbent upon the State to protect the financial integrity of the state retirement program by reducing its $1.6 billion unfunded liability. However, understanding the current fiscal crisis the State faces, your Committee feels it prudent to eliminate the requirement that the state and county governments make up the $99.4 million shortfall from FY 1995. Your Committee *708 also believes that the ERS must begin to retain all of its investment earnings from FY 1997 in order to begin the systematic liquidation of its unfunded liability.

Stand. Comm. Rep. No. 486, in 1997 Senate Journal, at 1092 (emphasis added). Thus, in 1997 the legislature amended HRS § 88-107 with the addition of the following:
In fiscal year 1996, twenty per cent of the actual investment earnings in excess of the investment yield rate shall be deposited in the pension accumulation fund; remaining excess earnings shall be applied to the amount contributed under section 88-123.[[8]] Beginning in fiscal year 1997, one hundred per cent of the investment earnings shall be deposited in the pension accumulation fund.
1997 Haw. Sess. L. Act 327, § 2 at 774.
But two years after passing Act 327, the legislature enacted Act 100, which amended HRS § 88-107 (Supp.1998), and retroactively reduced the amounts the State and counties contributed to the ERS in fiscal years 1997 and 1998 by crediting actuarial investment earnings in excess of ten percent of the actuarial investment yield rate toward the State and county contributions. 1999 Haw. Sess. L. Act 100, § 1 at 368. Act 100 stated that "[t]he savings realized by the State and the counties . . . shall be utilized for the purpose of funding retroactive cost items for [the Hawai`i Government Employees Association (HGEA) ] and [United Public Workers (UPW) ] contracts . . . and other necessary items." 1999 Haw. Sess. L. Act 100, § 3 at 369. Act 100, amended HRS § 88-107, entitled "Interest," by deleting the bracketed text and adding the underscored language to read as follows:
(a) The board of trustees shall annually allocate the interest and other earnings of the system to the funds of the system, as follows:
(1) The annuity savings fund shall be credited with the amount of regular interest credited to members' accounts;
(2) The expense fund shall be credited with such sums as provided in section 88-116; and
(3) The remaining investment earnings, if any, shall be credited to the pension accumulation fund.
(b) Beginning with actual investment earnings in fiscal year 1995 in excess of the investment yield rate, to address outstanding unfunded pension obligations, ten per cent of such excess earnings shall be deposited in the pension accumulation fund; remaining excess earnings shall be applied to the amounts to be contributed under section 88-123. In fiscal year 1996, twenty per cent of the actual investment earnings in excess of the investment yield rate shall be deposited in the pension accumulation fund; remaining excess earnings shall be applied to the amount contributed under section 88-123. In fiscal years 1997 and 1998, actuarial investment earnings in excess of a ten per cent actuarial investment yield rate shall be applied to the amount contributed under section 88-123. Beginning in fiscal year [1997,] 1999, one hundred per cent of the investment earnings shall be deposited in the pension accumulation fund.
(c) The application of actuarial investment earnings to the amount contributed under section 88-123 for fiscal years 1997 and 1998 as provided in subsection (b) is a one-time only provision and no law shall be enacted to again require the employees' retirement system to apply actuarial investment earnings to offset the amount contributed under section 88-123.
1999 Haw. Sess. L. Act 100, § 1 at 368 (underscoring and brackets in original.) Section 1 of Act 100 took effect retroactive to July 1, 1996. 1999 Haw. Sess. L. Act 100, § 9 at 370.
As emphasized supra, instead of permitting the ERS to retain one hundred percent of earnings beginning in 1997, as provided by Act 327 of the 1997 legislative session, Act 100 stated that "actuarial investment earnings in excess of a ten percent investment *709 yield rate" in fiscal years 1997 and 1998, would be credited against employer contributions required for those years. 1999 Haw. Sess. L. Act 100, § 1 at 368. The ERS would not be able to retain one hundred percent of the excess earnings until fiscal year 1999. Id. There were no offsetting benefits to the system overall, such as the State's former guarantee to make up deficits in bad years.

III.

A.
On April 23, 2002, Kaho`ohanohano, Andrade, and SHOPO filed a class action suit on behalf of the members of the ERS against the State alleging that Act 100 diverted $346.9 million from the ERS, in breach of the State's contractual obligations to ERS members, and in violation of article XVI, section 2 of the Hawai`i Constitution. The lawsuit sought declaratory and injunctive relief, and specifically (1) a declaration that Act 100 was unconstitutional and otherwise unlawful; (2) an injunction preventing the State from taking any future actions that would "impair or diminish" the ERS; and (3) monetary damages in the amount of $346.9 million, plus lost earnings thereon.
On July 2, 2002, the State filed a motion to dismiss Plaintiffs' complaint on the grounds that (1) Plaintiffs lacked standing; (2) the action was not ripe for adjudication; (3) the claim for declaratory relief was moot; and (4) the action involved a non-justiciable political question. Intervenor Defendant-Appellee/Cross-Appellant/Cross-Appellee City and County of Honolulu (Honolulu County) and Additional Defendants-Appellees/Cross-Appellees/Cross-Appellants County of Kauai (Kauai County), County of Maui (Maui County), and County of Hawai`i (Hawai`i County) joined the State's motion.
On July 29, 2002, Plaintiffs filed a motion to certify the class they represented, which the court subsequently granted on March 14, 2003.
On August 28, 2002, Honolulu County moved to intervene as a defendant and its motion was subsequently granted by the court.
On October 1, 2002, Plaintiffs filed their First Amended Complaint in order to include two additional class representatives, Efhan and Caravalho.
Also on October 1, 2002, Plaintiffs filed two separate motions for partial summary judgment. The first motion sought a declaratory judgment that Act 100 violated article XVI, section 2, and was therefore unconstitutional. The second motion requested an order declaring that Act 100 breached the contractual rights with respect to the ERS.

B.
On October 8, 2002, Honolulu County filed a motion to join Trustees as a "necessary additional party" and/or in substitution of Plaintiffs as the real party in interest, and sought an order of joinder of Kaua`i County, Maui County, and Hawai`i County as additional defendants.
On November 15, 2002, Trustees moved to intervene. Also on November 15, the court held a hearing and orally granted Honolulu County's motion as to the joinder of Kaua`i County, Maui County, and Hawai`i County as additional defendants and Trustees' motion to intervene.
On December 17, 2002, Plaintiffs filed a motion for leave to file a second amended complaint to add breach of contract claims against the counties, which was orally granted on January 10, 2003.
On December 31, 2002, Honolulu County filed a motion to dismiss Plaintiffs as not being the real party in interest. Kauai County, Maui County, and Hawai`i County joined Honolulu County's motion.
On January 7, 2003, an order granting in part and denying in part Honolulu County's October 8, 2002 motion was filed, and Kauai County, Maui County, and Hawai`i County were joined as parties.
On January 10, 2003, the State filed a motion for summary judgment against Plaintiffs and Trustees on the grounds that Plaintiffs' claims against the State were barred by (1) the doctrine of sovereign immunity and (2) the two-year statute of limitations set *710 forth in HRS § 661-5 (1993); and (3) as a matter of law, Act 100 was constitutional and Plaintiffs cannot establish that the act is contrary to or violative of article XVI, section 2 of the Hawai`i Constitution. The State also argued that it was entitled to summary judgment because Plaintiffs were not employees of the State and, therefore, lacked privity of contract with the State.
On January 28, 2003, Trustees filed their complaint against the State challenging the constitutionality of Act 100 and alleging that the act unlawfully diminished and impaired ERS funds, risked the actuarial soundness of the ERS, denied the ERS members protection of the funds, and interfered with the discretion of Trustees in the investment and reinvestment of ERS funds.

C.
On February 27, 2003, the court held a hearing on the State's July 2, 2002 motion to dismiss, and Honolulu County's December 31, 2002 motion to dismiss. With respect to the State's motion, the court stated:
I think the question before the [c]ourt is the question of standing. And I think earlier the [c]ourt in this proceeding the [c]ourt articulated its scope of inquiry to be whether or not [P]laintiffs do, in fact, have certain rights with regard to the sound actuarial condition of the [ERS]. I think as a result of the discussion, the [c]ourt has come to the realization that that determination is probably best left to another day.

At this time, what the [c]ourt needs to adjudicate is whether the individual named [P]laintiffs have a sufficient interest in the outcome so as to justify their prosecution of the claims in this case. We will get into it a little bit with regard to [Honolulu County's] motion, but the mere fact that monies at this time, in this action, may not actually be paid to the [P]laintiffs doesn't end this court's inquiry because there are equitable relief that is also prayed for by the individual named [P]laintiffs.
At this time, there were references by both the [S]tate and the [P]laintiffs to submissions contained in thein connection with the motion for summary judgment, and I think this court at least would be more comfortable availing itself of that more complete record to adjudicate whether or not the individual named [P]laintiffs have a specific right or interest in the surplus accounts or excess earning accounts. So the court at this time concludes that the [P]laintiffs do have a sufficient interest in the outcome to justify this matter going forward on their behalf, so the [c]ourt will respectfully deny the [S]tate's motion to dismiss, certainly without prejudice to raising at the time of the motions for summary judgment any and all arguments raised at this proceeding.
(Emphases added.) "[T]he [c]ourt [elected] under [Hawai`i Rules of Civil Procedure (HRCP) ] Rule 52 not to make any specific findings of fact or conclusions of law." It stated that "[a] simple order denying the motion for good cause iswill be sufficient."
The court further ruled:
Turning to [Honolulu County's] motion, which is the motion regarding real party in interest. I think the [c]ourt's alluded to its inclination that simply because damages may not be paid to the individuals named, that is not dispositive of their ability to prosecute this case in their own names and as representatives of a larger class. So the [c]ourt is inclined to deny that motion and all joinders.

(Emphasis added.)
On March 17 and 18, 2003, the court held a hearing on the State's January 10, 2003 motion for summary judgment and Plaintiffs' two separate October 1, 2002 motions for partial summary judgment. At the end of the hearing, the court granted the State's motion for summary judgment against Plaintiffs and Trustees, and denied Plaintiffs' motions for partial summary judgment. The court stated that it did not agree with the sovereign immunity argument and "[P]laintiffs could sue and bring this action if in fact Act 100 were unconstitutional." The court also dismissed the statute of limitations argument.
The court instead found that there had been an "insufficient showing that the Constitutional *711 Convention of 1950 intended to restrict the State's power and flexibility to enact future legislation as long as it did not diminish or impair the accrued benefits" and that "the phrase accrued benefits does not include the right of the members to an actuarially sound retirement system." Thus, the court concluded that Act 100 was constitutional as a matter of law. Specifically, the court determined that "it was incumbent upon this [c]ourt to construe the language of [a]rticle XVI, section 2 to determine whether in fact the [P]laintiffs have a right."
According to the court, it "elect[ed] pursuant to [HRCP] Rule 52 not to make any specific findings of fact and conclusions of law but simply [to issue] an order disposing of the motion which would incorporate any good cause shown in the record to sustain the [c]ourt's ruling." In discussing the remaining claims, the court stated, "I still like my idea of a dismissal without prejudice that could be reinstated in the event of a remand. It's cleanest. It doesn't prejudice anyone. I hope to still be the judge here if the matter comes back down."
On May 16, 2003, the court entered its written "Order Denying [the State's] Motion to Dismiss and [Honolulu County's] Motion to Dismiss the Individual Plaintiffs." The order states in relevant part:
For good cause, IT IS HEREBY ORDERED that [the State's] Motion to Dismiss filed June 28, 2002, and all joinders therewith, are DENIED without prejudice.
For good cause, IT IS HEREBY ORDERED that [Honolulu County's] Motion to Dismiss the Individual Plaintiffs, filed December 31, 2002, and all joinders therewith, are DENIED without prejudice.
The court's June 24, 2003 written judgment confirmed that the State's motion for summary judgment against Plaintiffs and Trustees was granted, and that Plaintiffs' motions for partial summary judgment based on article XVI, section 2, and for breach of contract, were denied. The judgment further specified, "[A]ll other claims in this action (including, without limitation, the claims in [P]laintiffs' Second Amended Complaint against [Honolulu County, Kauai County, Maui County, and Hawai`i County] ) were dismissed without prejudice, sua sponte."
On June 27, 2003, Honolulu County filed a motion to alter or amend the order granting the State's motion for summary judgment and denying Plaintiffs' motions for partial summary judgment, and the June 24, 2003 judgment in favor of the State on the basis that Honolulu County was entitled to a judgment in its favor. The other three counties joined in the motion. No order disposing of the motion was entered on the record within ninety days after the motion was filed. Thus, for purposes of HRAP 4(a)(3), the motion was deemed denied on September 25, 2003, ninety days after the filing of the June 27, 2003 motion.
On October 24, 2003, Plaintiffs and Trustees filed notices of appeal from the June 24, 2003 final judgment.
On November 6, 2003 and November 7, 2003, Hawai`i County, Honolulu County, Maui County, and Kaua`i County [collectively, the Counties] filed cross-appeals from the June 24, 2003 final judgment in favor of the State and against Plaintiffs and Trustees, and from the denial of (1) Honolulu County's June 27, 2003 motion to alter or amend, and (2) Hawai`i County's, Maui County's, and Kaua`i County's joinder to Honolulu County's June 27, 2003 motion to alter or amend.[9]
On November 7, 2003, the State filed a cross-appeal from the court's May 16, 2003 order denying the State's motion to dismiss.

IV.
Initially, the State argues on appeal that (1) Trustees "lack standing to bring their complaint in intervention"; (2) "Plaintiffs lack standing to bring this lawsuit"; (3) Plaintiffs'"action is not ripe for adjudication"; *712 (4) Trustees' and Plaintiffs' claims for declaratory relief are moot; (5) "this lawsuit involves `political questions' and is not justiciable"; (6) "Trustees' action against the State is barred by the doctrine of sovereign immunity"; and (7) "Trustees' action against the State is barred by the 2-year statute of limitations set forth in HRS § 661-5." We consider, first, the question of Plaintiffs' standing.

V.
As to the issue of standing, generally it has been declared by this court that "[s]tanding is concerned with whether the parties have the right to bring suit." Pele Def. Fund v. Puna Geothermal Venture, 77 Hawai`i 64, 67, 881 P.2d 1210, 1213 (1994) (internal quotation marks and citation omitted). "`[T]he crucial inquiry with regard to standing is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his or her invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his or her behalf.'" Mottl v. Miyahira, 95 Hawai`i 381, 389, 23 P.3d 716, 724 (2001) (quoting In re Matson Navigation Co. v. Fed. Deposit Ins. Corp., 81 Hawai`i 270, 275, 916 P.2d 680, 685 (1996)) (emphasis added). In determining whether a plaintiff has standing, the court "look[s] solely to whether [the plaintiff] is the proper plaintiff . . ., without regard to the merits of the allegations." Hawaii's Thousand Friends v. Anderson, 70 Haw. 276, 281, 768 P.2d 1293, 1298 (1989).
In addition, in analyzing whether a party has standing, "[o]ur touchstone remains the needs of justice." Life of the Land v. Land Use Comm'n, 63 Haw. 166, 176, 623 P.2d 431, 441 (1981) (internal quotation marks and citation omitted). Hence, "while every challenge to governmental action has not been sanctioned, our basic position has been that standing requirements should not be barriers to justice." Id. at 173-74, 623 P.2d at 439. Thus, "[o]ne whose legitimate interest is in fact injured by illegal action of an agency or officer should have standing because justice requires that such a party should have a chance to show that the action that hurts his interest is illegal." Id. at 174 n. 8, 623 P.2d at 439 n. 8 (internal quotation marks and citations omitted) (emphasis added). Moreover, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." Sierra Club v. Hawaii Tourism Auth., 100 Hawai`i 242, 250-51, 59 P.3d 877, 885-86 (2002) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (other citations omitted)) (brackets omitted). Additionally, "[a]n organization . . . has standing to sue for injury to its own interests, separate from any injury to its members, inasmuch as standing may be established in an individual or representative capacity." Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, 113 Hawai`i 77, 100-01, 148 P.3d 1179, 1202-03 (2006) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)).

VI.
Thus, "[i]n deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury." Akinaka v. Disciplinary Bd. of the Hawai`i Supreme Court, 91 Hawai`i 51, 55, 979 P.2d 1077, 1081 (1999) (citing Bush v. Watson, 81 Hawai`i 474, 479, 918 P.2d 1130, 1135 (1996)). Furthermore, "[w]ith respect to the first prong of this test, the plaintiff must show a distinct and palpable injury to himself or herself. The injury must be distinct and palpable, as opposed to abstract, conjectural, or merely hypothetical." Id. (internal quotation marks, brackets, and citations omitted) (emphasis added). Because "the test is stated in the conjunctive, [a plaintiff] must satisfy all three prongs to establish its standing." Sierra Club, 100 Hawaii at 250, 59 P.3d at 885.

VII.
As to the State's argument (2), the parties appear to agree that the central issue as to Plaintiffs' standing is the first prong of the *713 Akinaka test, namely, "has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct[.]" 91 Hawai`i at 55, 979 P.2d at 1081 (citation omitted) (emphasis added). In its Opening Brief, the State argues that each individual Plaintiff lacks standing.
First, the State argues that Kaho`ohanohano, who although retired, "has not alleged or shown that his `retirement allowance' or `accrued benefits' ha[ve] actually been impaired or diminished by Act 100." Specifically, the State maintains that Kaho`ohanohano "admitted that[ ] (1) he was paid his retirement allowance under Chapter 88 of the [HRS] and (2) the ERS has not stopped paying him his retirement allowance because of Act 100."
Second, the State similarly contends that Andrade and Efhan have "not alleged or shown that their `accrued benefits' or `retirement allowance' was actually impaired or diminished by Act 100." The State argues that Efhan "admitted that[ ] (1) she has not retired as an employee of the State or any of the counties; (2) she is a Class C member[[10]] ; and (3) she is not entitled to receive payment of any retirement allowance under Chapter 88 of the [HRS]." The State does not provide any specific argument as to Andrade.
Next, the State argues that Caravalho, "who has been a [State] employee since March of 1998 . . . [,] was not even eligible to receive a retirement allowance since she does not have 10 years of credited service and has not attained the age of 62 or [obtained] 30 years of credited service and [reached] the age of 55."[11] The State indicates that Caravalho admitted that "(1) she has not retired as an employee of the [State] or any of the counties; (2) she is a Class C member; (3) she does not have 20 years of credited service under [HRS § ]88-272 [ (1993) ]; and (4) she is not entitled to receive payment of any retirement allowance under Chapter 88 of the [HRS]." Thus, the State maintains that Caravalho "has not alleged or shown that her `accrued benefits' or `retirement allowance' was actually diminished or impaired by Act 100."
Finally, the State claims that "SHOPO has not alleged or shown that any of its members' `accrued benefits' or `retirement allowance' was actually diminished or impaired by Act 100." The State asserts that "SHOPO admitted[ ] (1) under Chapter 89 of the [HRS], it was not the representative of any employee of the [State]; (2) its members were employed by the counties; and (3) it has no knowledge as to whether or not any state or county retiree has been denied his or her retirement allowance as a result of Act 100."

VIII.
Plaintiffs respond that (1) they have "standing to sue because [they] allege[d a] threatened injury to concrete interests"; (2) "controlling New York law confers standing"; (3) "other state courts recognize members standing"; and (4) "the State's legal authority is inapt."

IX.
In regard to Plaintiffs' argument (1), Plaintiffs note that the "State's argument focuses on only the first element of the `injury in fact' test" and that "the State's argument reads the phrase `threatened injury' out of Hawaii's standing analysis." Plaintiffs question that "if the framers of the Hawai`i Constitution meant to protect only the amount of the benefits check, why would they have *714 expressly protected `accrued benefits' from both diminishment and impairment?"
According to Plaintiffs, "[p]rotection only from diminishment would have given the ERS members all the protection the State here argues they have standing to assert. For the [Hawai`i] Constitution's protection against `impairment' to be given effect, impairment must be seen as what it is, an actual injury realized today." Plaintiffs further assert that "even under the most stringent construction against them, the [Hawai`i] Constitution's use of the word `impair' must contemplate the sort of `threatened injury' that Hawaii's standing doctrine also encompasses."

X.
The State cites Mottl for its assertion that Plaintiffs suffered no "actual or threatened injury" in the instant case. In Mottl, the University of Hawai`i Professional Assembly and faculty members, some of whom were also state legislators, brought an action against the governor and the State Director of Finance challenging their decision to reduce the University of Hawaii's allotment of funds appropriated for a specific fiscal year. 95 Hawai`i at 385, 23 P.3d at 720. The plaintiffs sought "declaratory and injunctive relief . . . to prevent the implementation of the `payroll lag act.'" Id. at 383, 23 P.3d at 718 (citation omitted). They alleged that "the withholding of six million dollars from the University of Hawaii's appropriation resulted in `a loss of support for working conditions, teaching programs, research programs, discretionary support staff, replacement of consumable items, and . . . electricity and telephone charges[.]'" Id. at 394, 23 P.3d at 729 (ellipses in original).
However, despite the aforementioned argument, this court held that the individual plaintiffs lacked standing to pursue the lawsuit because they were unable to show a "specific and personal injury" under the Akinaka test and only alleged an injury that was "abstract, conjectural, or merely hypothetical."

The plaintiffs do not attempt to prove any specific and personal injury but, rather, press their general proposition that, in any organization, a loss of six million dollars from its budget must have some negative effect on its operations, ultimately affecting all of its employees. Their argument calls for assumptions or inferences that are not supported by the record or any case law that the plaintiffs cite. Accordingly, the injury that the plaintiffs assert is "abstract, conjectural, or merely hypothetical." Akinaka, 91 Hawai`i at 55, 979 P.2d at 1081. Citizens for Protection of North Kohala Coastline [v. County of Hawai`i], 91 Hawai`i [94,] 100, 979 P.2d [1120,] 1126 [ (1999) ], does not abrogate the "injury in fact" standing requirement in actions for declaratory relief affecting a public interest, but merely mandates less demanding standards in assessing the plaintiffs' proof of an "injury in fact." Inasmuch as the plaintiffs have failed to demonstrate that they suffered an injury to a recognized interest, as opposed to merely airing a political or intellectual grievance, Akau [v. Olohana Corp., 65 Haw. 383,] 390, 652 P.2d [1130,] 1135 ( [1982) ], we hold that the plaintiffs lacked standing to pursue the present action.

Id. at 395, 23 P.3d at 730 (some emphasis in original and some added). The State notes that with respect to a threatened injury that has not yet occurred, a plaintiff must allege that he or she is "immediately in danger of sustaining some direct injury" and the injury "must be both real and immediate[.]" O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (internal quotation marks and citations omitted).

XI.
Like the plaintiffs in Mottl, it appears that Plaintiffs here have failed to allege a "an actual or threatened injury" sufficient to meet the first prong of the Akinaka test. See Mottl, 95 Hawai`i at 395, 23 P.3d at 730. No individual plaintiff has been able to show how he or she has suffered an actual or threatened "distinct and palpable injury[,]" Akinaka, 91 Hawai`i at 55, 979 P.2d at 1081 (internal quotation marks and citation omitted), to him or herself or how they have personally "suffered an injury to a recognized *715 interest[,]" Mottl, 95 Hawai`i at 395, 23 P.3d at 730 (citation omitted).
Similar to the Mottl plaintiffs' argument that "a loss of six million dollars from its budget must have some negative effect on its operations, ultimately affecting all of its employees[,]" id. (emphasis in original), Plaintiffs here attempt to show that impairing the system by removing funds will ultimately effect all members of the ERS. However, as this court said in Mottl, that contention is "abstract, conjectural, or merely hypothetical" with respect to each individual plaintiff. Id. (internal quotation marks and citations omitted).

XII.
The State also cites to Retirement Board of the Employees Retirement System of Providence v. Cianci, 722 A.2d 1196 (R.I. 1999), for the proposition that Plaintiffs have "not alleged or shown a `distinct and palpable injury'" to themselves "involving a legally protected interest." In Cianci, the plaintiffs included a retired employee and a current employee who brought suit because the city failed to fund the retirement system with the amount initially recommended by the official actuary by the city. Id. at 1197. The plaintiffs sought declaratory relief and a judgment for mandamus ordering the city to make payments to the retirement fund in an amount sufficient to meet the actuarial recommendations. Id. The Cianci court determined that the two employees lacked standing to bring the suit because they were unable to show an "injury in fact." Id. at 1198.

[T]he employees have not shown an injury in fact since neither has alleged nor can allege that he or she has not received any pension benefit to which he or she is entitled. The retired employee has received retirement benefits as they become due and the non-retired employee is not yet eligible to receive such benefits.
[Further] there is no immediate threat that the pension fund will become insolvent, and that there has been no showing that the deferment of the [cost of living adjustment] shortfall will jeopardize any person's particular pension benefits at any particular time.
Id. (emphasis added).
Although Plaintiffs attempt to distinguish Cianci by stating that "the Rhode Island court failed to recognize that a `threatened injury' to a concrete interest is just as sufficient to convey standing as an injury that has already occurred[,]" as emphasized above, the Rhode Island court found that there was "no immediate threat that the pension fund [would] become insolvent." Id. Thus, Cianci did analyze whether the plaintiffs suffered a threatened injury by failing to fund the system.
Cianci is instructive. Like the Cianci plaintiffs, Plaintiffs are retired and current employees challenging the State's failure to fund the retirement system but are unable to show that they have "not received any pension benefit to which he or she is entitled[,]" nor have they been able to show any "immediate threat that the pension fund will become insolvent[.]" Id. Thus, Cianci supports the conclusion that Plaintiffs here lack standing.

XIII.
Plaintiffs note that "[t]his court recently confirmed that a plaintiff need not `wait until its concrete interests were injured' before bringing suit; the plaintiff need only show that it has concrete interests that will be injured if the threat materializes." (Citing Sierra Club, 100 Hawai`i at 252 n. 16, 59 P.3d at 887 n. 16.). But as the State notes, Kaho`ohanohano is retired and his retirement allowance under Chapter 88 has not been reduced or stopped as a result of Act 100. Although he does not have to wait "until [his] concrete interests were injured[,]" Kaho`ohanohano has not shown he faces a "threatened injury as a result of [the State's] conduct." Sierra Club, 100 Hawai`i at 252 n. 16, 59 P.3d at 887 n. 16 (internal quotation marks, emphasis, brackets, and citation omitted). He has not alleged that his benefits are likely to be reduced, delayed, or stopped as a result of Act 100.
As to those plaintiffs that are currently employed, obviously, because they are *716 not retired, they are not yet receiving retirement benefits. Efhan admitted that she was not yet eligible to receive such benefits. The same is true of Caravalho, who has also not yet obtained the ten years of credited service required under HRS § 88-272.[12] Thus, their claims are further removed than those of Kaho`ohanohano and they have made no showing that their retirement benefits are likely to be reduced, delayed, or stopped as a result of Act 100. Finally, as to SHOPO, the labor organization representing police officers whose members are employed by the counties of Honolulu, Kaua`i, Maui, or Hawai`i, it admitted that it has "no knowledge as to whether any [S]tate or county employee had been denied his or her retirement allowance as a result of Act 100." SHOPO does not allege that any of its members have not received their retirement benefits or are currently in danger of not receiving them. Thus, SHOPO has been unable to show an "actual or threatened injury" to itself or its members that is "distinct and palpable[.]" Akinaka, 91 Hawai`i at 55, 979 P.2d at 1081 (internal quotation marks and citation omitted).

XIV.
Plaintiffs rely on the testimony of their actuarial expert as evidence of an injury to all Plaintiffs. However, Plaintiffs' expert, Mark Johnson (Johnson), although fully explaining how the diversion of $346.9 million impaired the retirement system itself, does not show how each individual Plaintiff faces an "actual or threatened injury."
Plaintiffs argue that diminishing ERS assets "postponed the day when employee contributions could be decreased or suspended; increased the risk of nonpayment, partial payment, or delayed payment of benefits; and made it more likely that there would be further deferrals or diversions of employer contributions in the future[.]" Johnson stated that, "[b]y diverting $346.9 million from the ERS, the legislature lessened the possibility of members receiving benefit enhancements in the future." He further explained that some examples of "benefit enhancements" from other states include the provision of additional benefits after 30 years of service, credit in pension formula for unused sick leave, increased minimum benefit for current retirees, and automatic cost of living increases. Because Plaintiffs have not put forth any evidence they would have received, or were entitled to, these benefits, the alleged injury is speculative.
Johnson further recounted that in some other states, where a retirement system is "fully funded," the retirement system suspends employee and employer contributions. Thus he argued that "the diversion of $346.9 million from the ERS postpones the day when employee contributions could be decreased or suspended." However, like enhanced benefits, there is no evidence presented of when and if the ERS would become fully funded and suspend employee contributions. To conclude that Plaintiffs face a threatened injury because "Act 100 postpones the day" when their contributions "could be decreased or suspended" does not rise to the level of an "actual or threatened" injury. Akinaka, 91 Hawai`i at 55, 979 P.2d at 1081 (citation omitted).
*717 Finally, Johnson stated that "[t]he diversion of $346.9 million from the ERS increased the system's unfunded liability"; thus, he contended that "Act 100 and other history involving the State's funding of the ERS mark a disturbing trend that could lead, in the not unforeseeable future, to a delay or reduction in the payment of pension checks to some or all of the members." Once again, while this trend is disturbing, a prediction that Act 100 "could lead, in the not unforeseeable future, to a delay or reduction" in retirement payments is not sufficient to rise to the level of a threatened injury as to an individual Plaintiff on this record.

XV.
In connection with their first argument, regarding the plain language of article XVI, section 2, while both "diminishment" and "impairment" describe different adverse consequences, Plaintiffs have nonetheless been unable to show sufficient, distinct, and personal injury here. As was explained previously, this court cannot ascribe standing simply because "we are cognizant of the concerns raised by [Plaintiffs.]" Sierra Club, 100 Hawai`i at 250, 59 P.3d at 885. Plaintiffs must be able to show that they have "suffered an actual or threatened injury as a result of [the State's] conduct[,]" and for the foregoing reasons, that has not been demonstrated here.

XVI.
In regard to Plaintiffs' argument (2), Plaintiffs argue that "[t]he law explicitly provides that membership in the ERS commences as of the date of hire, [HRS § 88-42,] . . . [a]rticle XVI, section 2 provides that membership in the system is a `contractual relationship[,]'" and "[s]tanding to enforce the `contractual relationship' recognized by the [Hawai`i] Constitution was decided under New York law before Hawai`i statehood." (Citing Birnbaum v. New York State Teachers' Ret. Sys., 5 N.Y.2d 1, 176 N.Y.S.2d 984, 152 N.E.2d 241 (1958).).
In Birnbaum, the plaintiffs brought an action for a declaratory judgment "on behalf of themselves and all other school teachers in the State of New York similarly situated." Id. at 243. The plaintiffs challenged the validity of adopting a particular actuarial table for computing the annuity benefits of the members. Id. They argued that the new table constituted "a breach of the contractual relationship established by [the New York constitutional pension provision] as to members of the retirement system[.]" Id. New York's highest court rejected the defendants' argument that the plaintiffs did not have standing.
Neither of the plaintiffs has resigned or applied for retirement. Also recognized, is the possibility as urged by the defendant, that one or both of the plaintiffs may cease their employment as teachers in the public school prior to attaining retirement status, in which event they could withdraw their accumulated contributions to the pension system and the mortality tables in effect would have no bearing. However, the security offered by membership in the retirement system is generally regarded as an inducement to employment in state service or in the public schools. The value of retirement benefits and prospective rate of payment, especially in the face of continued inflation, is of vital concern to the plaintiffs and might well be the determining factor in their decision to continue in the teaching profession or seek more lucrative employment.

Id. (emphasis added). Birnbaum further stated that "[b]y the constitutional amendment the people determined to confer contractual protections upon the benefits of pension and retirement systems of the State and of the civil divisions thereof, and to prohibit their diminution or impairment prior to retirement." Id. at 987-88, 152 N.E.2d at 244-45.
Assuming, arguendo, that Birnbaum supports conferring standing on Plaintiffs because of the "contractual relationship" clause in our own pension provision, we need not accept Birnbaum as persuasive in this case because we employ our own "injury in fact test" in determining standing. The Birnbaum court's standing analysis appears to be limited to affirming the lower court's conclusion that the pension system served as an inducement to employment and did not include *718 an analysis that in any way resembled the Akinaka test that we employ. See supra.

XVII.
In regard to Plaintiffs' argument (3), Plaintiffs focus on Dombrowski v. City of Philadelphia, 431 Pa. 199, 245 A.2d 238 (1968). They argue that in that case, where a city employee, who would not be eligible for retirement for another six years, sued to compel the city to make necessary appropriations to the retirement system, the Supreme Court of Pennsylvania determined that the employee's "vested right to his retirement benefits, and his contractual relationship to the city and its retirement system are interests he does not share with the general public and which he holds independent of the public."[13]Id. at 244.
Dombrowski involved an "action in mandamus." The mandamus statute in that case stated that a writ "shall issue on the application of any person beneficially interested." Id. at 242 (emphasis added). The case law interpreting that statute declared that "the relevant [standing] inquiry [was] whether the private plaintiff possesses an interest which is not shared by the public at large." Id. Thus the standing standard did not resemble the Akinaka test and did not require any showing of injury but only that the person be "beneficially interested" or possess "an interest which is not shared by the public at large." Id. Thus, Dombrowski is not persuasive in an analysis of Plaintiffs' standing.

XVIII.
Doubtless, Plaintiffs performed a service for the retirement system and future retirees by filing a suit that the Trustees may have been obligated to bring in the first place. However, as indicated herein, Plaintiffs lack legal standing to bring the suit. For the foregoing reasons, Plaintiffs do not meet the "actual or threatened injury" requirement to show standing in this case. Thus, analysis of the other two prongs of the Akinaka test are not necessary. Plaintiffs do not provide any argument that would indicate that the second and third prongs of the Akinaka test have been satisfied.

XIX.
As to the Trustees' standing and State's argument (1), it should be noted that this issue is raised for the first time by the State on appeal, and was thus not addressed by the court. Nonetheless, "[b]ecause standing is a jurisdictional issue that may be addressed at any stage of a case, an appellate court has jurisdiction to resolve questions regarding standing, even if that determination ultimately precludes jurisdiction over the merits." Keahole Def. Coal., Inc. v. Bd. of Land & Natural Res., 110 Hawai`i 419, 427-28, 134 P.3d 585, 593-94 (2006) (citing United Pub. Workers, Local 646 v. Brown, 80 Hawai`i 376, 379, 910 P.2d 147, 150 (App.1996)).

XX.
As to the first prong of the three-part Akinaka test, Akinaka, 91 Hawai`i at 55, 979 P.2d at 1081, it is preliminarily observed that, to reiterate, the ERS has "the powers and privileges of a corporation[.]" HRS § 88-22. The ERS "may sue or be sued, transact all of its business, invest all of its funds, and hold all of its cash and securities and other property" in its own name. Id. Trustees are charged with "[t]he general administration *719 and the responsibility for the proper operation of the retirement system and for making effective the provisions of this part and part VII[14] of this chapter[.]" HRS § 88-23. In that regard, "[i]t is axiomatic that a corporation's directors and officers assume fiduciary duties." Honda II, 108 Hawai`i at 343, 120 P.3d at 242 (citations omitted).
As recounted previously, the ERS funds are funded through employee and employer contributions, and investment earnings. In this respect, Trustees "shall be trustees of the several funds of the system and may invest and reinvest such funds as authorized by this part and by law from time to time provided." HRS § 88-110 (1993); see Honda II, 108 Hawai`i at 344, 120 P.3d at 243.
Furthermore, "any and all sums contributed or paid from whatever source to the system for the funds created by this part, and all funds of the system including any and all interest and earnings of the same, are and shall be held in trust by [Trustees] for the exclusive use and benefit of the system and for the members of the system and shall not be subject to appropriation for any other purpose whatsoever." HRS § 88-127; see Honda II, 108 Hawai`i at 344, 120 P.3d at 243. Hence, "Trustees, by definition, are imbued with fiduciary duties." Honda II, 108 Hawai`i at 343, 120 P.3d at 242 (citations omitted) As we have stated, "[Trustees] owe[] a `trust' duty to not just the `system' as a whole . . . but to `members of the system' as well." Id. at 344, 120 P.3d at 243 (emphasis in original).
Hence, "[i]t is within the power, and is the duty, of a trustee to institute action and proceedings for the protection of the trust estate and the enforcement of claims and rights belonging thereto, and to take all legal steps which may be reasonably necessary with relation to those objectives[,]" Brisnehan v. Cent. Bank & Trust Co., 134 Colo. 47, 299 P.2d 113, 115 (1956) (citation omitted). Moreover, "[it] is always the duty of a trustee to protect the trust property, and for that purpose institute actions, intervene in actions pending, and, in any other way, in accordance with orderly procedure, protect such property." Brenizer v. Supreme Council, Royal Arcanum, 141 N.C. 409, 53 S.E. 835, 838 (1906) (emphasis added). Thus, charged with general administration and responsibility for the proper operation of the retirement system, and the protection of the res, Trustees have a legal duty to protect the pension accumulation fund from diminishment and impairment, for the viability of the retirement system itself.

XXI.
On the face of their complaint,[15] it appears that Trustees have sufficiently alleged
*720 [Footnote] *721 "an actual or threatened injury as a result of the [State's alleged] wrongful conduct." See Akinaka, 91 Hawai`i at 55, 979 P.2d at 1081 (citation omitted).
First, as Trustees allege in paragraph 20 of the complaint, "[w]hen earnings of high-return years are skimmed, however, the ERS loses the benefit of high yields that would offset market cycles in low-return years and is denied the benefit of full, ongoing [e]mployer funding." Such an allegation, if taken as true, sufficiently establishes an injury-infact for purposes of standing, in that the ability of the ERS to offset "low-return years" both in the past and in the future is adversely altered. Because "[f]ull ongoing [e]mployer funding . . . is needed to assure stability and operation of the ERS on an actuarially sound basis," as Trustees state in paragraph 41 and reiterate in paragraph 42, it would be legally imperative for Trustees to bring suit and to question the validity of any statute which negatively impaired the ERS' continued stability and operation.
Second, Trustees alleged that they had a reasonable expectation of retaining all investment earnings in reliance on Act 327, which states that "[b]eginning in fiscal year 1997, one hundred per cent of the investment earnings shall be deposited in the pension accumulation fund." 1997 Haw. Sess. L. Act 327, § 2 at 774. Act 100 removes that expectation and thus inhibits Trustees' discretion in making investment choices that would be in the best interests of the ERS and its members.
Third, Trustees further claimed that by the enactment of Act 100, the State "unlawfully diminished and impaired the ERS funds," including investment earnings for fiscal years 1997 and 1998, in a retrospective fashion. Such impairment, Trustees claim, "deprives [the ERS] of the stability and security intended by the Hawai`i State Constitution and Hawai`i law."
Fourth, Trustees alleged that in addition to article XVI, section 2, "members of the ERS are entitled to an actuarially sound retirement system and to protection of funds held by or committed to the ERS" under "provisions of [HRS c]hapter 88." Under *722 such circumstances, Trustees rightfully maintain that they are legally obligated to protect the system and, thus, would have standing to challenge Act 100 in their capacity as fiduciaries.[16]Cf. Hawaii Medical Assoc., 113 Hawai`i at 103-04, 148 P.3d at 1205-06 (stating that the organization's allegation that the defendant's "conduct has frustrated [the organization's] pursuit of its underlying purpose, because [the defendant's] alleged wrongful practices have threatened its members' ability, inter alia, to provide medically necessary healthcare services and fulfill other aspects of their patients' care . . . sufficiently alleged direct injury to itself" and, therefore, that the organization "possesse[d] standing to bring suit on its own behalf as an organization to address that injury" (footnote and citations omitted)).

XXII.
The continuing injuries Trustees assert are manifested by the ERS reports for the fiscal years 2002, 2003, 2004, and 2005. Inasmuch as these reports are a matter of public record, and appropriate for judicial notice, their significance bears directly on the instant matter.[17]See Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir.2001) (noting that judicial notice may be taken of public records). Administrative reports can also be subject to judicial notice. See, e.g., Brown v. Valoff, 422 F.3d 926, 933 & n. 9 (9th Cir.2005) (taking judicial notice on appeal of an administrative bulletin); Mack v. S. Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir.1986) (court may take judicial notice of records and reports of state administrative bodies); see also State v. Vliet, 95 Hawai`i 94, 112-13, 19 P.3d 42, 60-61 (2001) (taking judicial notice on appeal of federal agency report in order to ascertain the validity of a scientific principle); Kyllo v. United States, 533 U.S. 27, 36 n. 3, 121 S.Ct. 2038, 150 L.Ed.2d 94 (noting, apparently sua sponte, the feasibility of "through-the-wall" technologies by citing to an internet website of a government agency in a Fourth Amendment challenge to a government search).
It is noteworthy that for fiscal year 2002, the ERS expressed the following concerns to the Governor:
We are concerned about the unfunded accrued liability[[18]] which increased from $991 million in June 2001 to $1.8 billion in June 2002 on an actuarial basis. When using the fair value of assets, the unfunded accrued liability was in excess of $3.3 billion. The use of ERS investment earnings to help balance the State and county governments' budgets and the negative investment returns over the past two years primarily contributed to the increase of the unfunded accrued liability.

Employees' Retirement System of the State of Hawai`i, Comprehensive Annual Financial Report [ (hereinafter ERS Financial Report) ] For the Fiscal Year Ended June 30, 2002 at 4 (Dec.2002) (emphasis added).
*723 The following year, the ERS reiterated its concerns as follows:
While we are encouraged by the positive results, we remain concerned about the unfunded accrued liability, which increased from $1.8 billion in June 2002 to $2.9 billion in June 2003 on an actuarial basis. The primary reason for the increase in the unfunded accrued liability was the negative investment returns over the prior two years.
ERS Financial Report For the Fiscal Year Ended June 30, 2003 at 4 (Dec. 8, 2003).[19] In 2004, the ERS submitted its report and stated as follows:
The ERS' unfunded actuarial accrued liability increased to $3.5 billion from $2.9 billion on June 30, 2003. The [UAAL] is primarily the result of unfavorable investment returns in FY 2001 and FY 2002, and the previous use of the ERS' excess investment earnings to reduce State and county government contributions to the ERS.

ERS Financial Report For the Fiscal Year Ended June 30, 2004 at 9 (Dec. 13, 2004) (emphasis added). Yet again, for 2005, the following was reported:
We are pleased to report that total assets grew to $9.2 billion as of June 30, 2005 and our investment portfolio generated an 11.3% return during the past fiscal year. While we are encouraged by the positive earnings, the actuarial funded ratio declined to 68.6% at the end of the fiscal year. This is primarily the result of the past diversion of excess investment earnings which prevented the ERS from establishing a rainy day fund for the years of poor investment returns.

ERS Financial Report For the Fiscal Year Ended June 30, 2005 at 5 (Dec. 29, 2005) (emphasis added).[20]
In sum, the ERS reports indicate that because of the legislature's diversion of excess investment earnings to reduction of employer contributions, the ERS has continued to suffer a large unfunded actuarial liability which in turn has and continues to diminish the investment opportunities available to the ERS, and prevented the ERS from "establishing a rainy day fund for the years of poor investment returns." Accordingly, the first prong of the Akinaka standing test, 91 Hawai`i at 55, 979 P.2d at 1081 (citation omitted), is satisfied. Cf. Chamber of Commerce of U.S. v. Sec. & Exch. Comm'n, 412 F.3d 133, 138 (D.C.Cir.2005) (ruling that "loss of the opportunity to purchase a desired produce is a legally cognizable injury" (citing Consumer Fed'n of Am. v. FCC, 348 F.3d 1009, 1011-12 (D.C.Cir.2003) (holding that injury-in-fact was present where merger would deprive plaintiff of opportunity to purchase desired service); Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin., 901 F.2d 107, 112-13 (D.C.Cir.1990) (noting injury-in-fact where regulations regarding fuel economy foreclosed buyers the opportunity to purchase larger passenger vehicles))).

*724 XXIII.
The second prong is also met inasmuch as the alleged injuries are "fairly traceable to the [State's] actions." Akinaka, 91 Hawai`i at 55, 979 P.2d at 1081 (citation omitted). As Trustees allege, and the ERS' public reports indicate, at the very core of the dispute is the impact of Act 100 on the viability of the retirement system.
The third prong is also satisfied inasmuch as a "favorable decision [would] likely provide relief" for Trustee's continuing alleged injury. Id. (citation omitted). First, on its face a claim for a declaratory judgment that "in diverting investment earnings from the ERS, Act 100 unlawfully interfered with and impaired the discretion of [Trustees] in the investment and reinvestment of the funds of the ERS," as Trustees seek, would vindicate Trustees' duties and obligations as fiduciaries. Second, for purposes of deciding standing, on its face a claim for injunctive relief would provide the assurance to the ERS and its members that the legislature would honor its representations that excess investment earnings would be retained by the ERS. On their faces the claims would ensure that the constitutional mandate under article XVI, section 2 would be implemented. Accordingly, because all three prongs of the Akinaka test are satisfied, see Sierra Club, 100 Hawaii at 250, 59 P.3d at 885, Trustees have standing as fiduciaries of the retirement system and its members to challenge legislation that would impair the ERS.

XXIV.
This holding is consistent with the propositions earlier enunciated in the concurring opinion in Mottl. To reiterate, in that case, the plaintiffs, certain faculty members of the University of Hawai`i, and the University of Hawaii Professional Assembly, brought an action against the then-Governor and the State Director of Finance, for declaratory and injunctive relief seeking the restoration to the University of Hawai`i funds that had been appropriated for fiscal year 1998, but which had been reduced by the passage of the "payroll lag act." 95 Hawai`i at 383, 23 P.3d at 718.
The defendants argued, inter alia, that the plaintiffs lacked standing to bring such an action. Id. at 386, 23 P.3d at 721. The defendants also argued that they were entitled to summary judgment inasmuch as their actions were within their constitutional and statutory authority. Id. Subsequently, the circuit court granted summary judgment based on its application of HRS § 37-37 (Supp.2006), and in part because of "plaintiffs' alleged `judicial admission' that the 1997 restriction on the University of Hawaii's fourth quarter allotment was legal." Id. at 388, 23 P.3d at 723.
On appeal, this court reversed the circuit court's grant of summary judgment, and instead instructed the circuit court to dismiss the plaintiffs' complaint on the ground that the plaintiffs lacked standing for failing to show an injury-in-fact. Id. at 395, 23 P.3d at 730. The concurrence addressed the issue of whether the Board of Regents of the University of Hawai`i (BOR) had standing to seek declaratory relief on behalf of the University of Hawai`i, a question left unanswered by the Mottl majority. The similarity between the position of the BOR in Mottl and the Board of Education (BOE) in Board of Education v. Waihee, 70 Haw. 253, 768 P.2d 1279 (1989), was evident as to the question of standing. It was observed that the standing of the BOE as a party was never challenged in Waihee. Mottl, 95 Hawai`i at 395-96, 23 P.3d at 730-31 (Acoba, J., concurring). In Waihee, this court did not reject the BOE's standing on appeal. See Keahole, 110 Hawai`i at 428 n. 18, 134 P.3d at 594 n. 18 (stating that an appellate court may raise the issue of standing sua sponte). The fact that this court did not do so confirmed the BOE's standing. Thus, as noted in the Mottl concurrence:
In a vein somewhat similar to the lawsuit before us, [in Waihee,] "the plaintiffs alleged the Governor interfered with the [BOE] implementation of the budget approved by the legislature when he imposed a one per cent spending restriction on the [Department of Education (DOE) ]. The Governor, the plaintiffs maintain[ed], may impose such restrictions only if sufficient funds are not available." Id. at 268, 768 *725 P.2d at 1288. In Waihee, no question arose as to the standing of the BOE to bring suit. However, as to the [Hawai`i State Teachers' Association (HSTA) ], this court noted its "doubts" as to HSTA's standing to bring suit, observing that "[t]he defendants challenge HSTA's standing to sue[, and alt]hough we have doubts that the [HSTA] has standing, we do not find it necessary to discuss the question." Id. at 256 n. 1, 768 P.2d at 1281 n. 1.
. . . The BOE stands in a position to the DOE similar to that occupied by the [BOR] with respect to the University of Hawai`i. The BOE is vested under our constitution with "the power, as provided by law, to formulate policy and to exercise control over the public school system," Haw. Const. art. X, § 3, and "jurisdiction over the internal organization and management of the public school system, as provided by law." Id. The [BOR] is constitutionally delegated "the power, as provided by law, to formulate policy, and to exercise control over the university," Haw. Const. art. X, § 6, and has "exclusive jurisdiction over the internal organization and management of the university." Id. Thus, the holding in Waihee suggests that the [BOR] would have "standing" to seek declaratory relief on behalf of the University of Hawai`i, under similar provisions in HRS §§ 37-36 (Supp.2000) and 37-37 (Supp. 2000).
95 Hawai`i at 395-96, 23 P.3d at 730-31 (Acoba, J., concurring) (some emphasis added and some in original).[21]
Recognizing the interest of the ERS and Trustees in the instant proceedings, and relying on the concurring opinion in Mottl, the court granted Trustees' motion to intervene:
[T]he [c]ourt is persuaded by the citation of the Mottl . . . case by the [Trustees] that [Trustees] is an appropriate entity to bring an action to represent it and its members. And clearly the ERS has the power to sue and be sued in its own right.
The following was added by the court:
The [c]ourt is also of the mind that [Trustees] has an interest in its own accord in this matter because [Trustees] is the entity that is charged with the obligation of managing the retirement system for future generations of persons who may have not even be born yet and so hope that the ERS will continue to live on beyond the years of the people who are actually named in the lawsuit. So [Trustees] may represent those individuals who may benefit in the future and have an interest in its own interest [sic] in that regard to protect those interests as well.
Akin to the BOR in Mottl, and the BOE in Waihee, Trustees are entitled to standing to challenge legislative actions impairing the retirement system, given at the least, Trustees' statutory obligations for "[t]he general administration and the responsibility for the proper operation of the [ERS]," under HRS § 88-23.

XXV.
Having determined the Trustees have standing to bring their complaint, we decide only those preliminary objections raised by the State in regard to the ERS. In conjunction with the State's argument (4) that the "Trustees' claim for declaratory relief is moot" because "Act 100 has been fully implemented by the ERS," (emphasis added), the State asserts that "the actual implementation of Act 100 was performed by the ERS" and that because the "ERS has been paid by the public employers[,] . . . there is nothing further to be done." The State specifically points to the ERS' actions of applying "$225,255,800 of excess earnings credit for fiscal year 2000 and $121,686,800 of excess earnings credit for fiscal year 2001, and calculat[ing] the specific amounts the [State] and each of the counties owed the ERS for fiscal years 2000 and 2001," to show the Act has been implemented.
Trustees reply that "[t]he State's argument . . . that once the Legislature passed Act 100 and the ERS calculated payments based on Act 100, the right to judicial relief *726 ceased" is without merit because the State is "[e]ssentially arguing that mootness means the courts cannot address a wrong once the wrong has occurred." Further, as Trustees note, "the State cites no authority for the proposition that . . . Trustees' claims are moot."

XXVI.
This court has explained mootness as follows:

A case is moot if it has lost its character as a present, live controversy of the kind that must exist if courts are to avoid advisory opinions on abstract propositions of law. The rule is one of the prudential rules of judicial self-governance founded in concern about the properand properly limitedrole of the courts in a democratic society. We have said the suit must remain alive throughout the course of litigation to the moment of final appellate disposition to escape the mootness bar.

Kona Old Hawaiian Trails Group v. Lyman, 69 Haw. 81, 87, 734 P.2d 161, 165 (1987) (internal citations, quotation marks, and brackets omitted). Simply put, "[a] case is moot if the reviewing court can no longer grant effective relief." City Bank v. Saje Ventures II, 7 Haw.App. 130, 134, 748 P.2d 812, 815 (1988) (quoting United States v. Oregon, 718 F.2d 299, 302 (9th Cir. 1983)).
Kemp v. State of Hawai`i Child Support Enforcement Agency, 111 Hawai`i 367, 385, 141 P.3d 1014, 1032 (2006) (emphases added).
Because the State argues only that Trustees' claims for declaratory relief are moot, we address only that contention. It has been noted that the dispositive question under HRS § 632-1 (1993),[22] authorizing actions for declaratory judgment, is "whether the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.' This is a question of law." Island Ins. Co. v. Perry, 94 Hawai`i 498, 502, 17 P.3d 847, 851 (App.2000) (quoting HRS § 632-1). Further, "[in determining whether parties still retain sufficient interests and injury as to justify the award of declaratory relief, the question is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant a declaratory judgment." United Public Workers, AFSCME, Local 646 v. Yogi, 101 Hawai`i 46, 57, 62 P.3d 189, 200 (2002) (Acoba, J., concurring) (quoting Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) (other citation omitted)) (internal quotation marks, brackets, and ellipses omitted).
As a matter of law, there manifestly remains a substantial controversy in this case and "`a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.'" Perry, 94 Hawai`i at 502, 17 P.3d at 851 (quoting HRS § 632-1). As noted above, Trustees requested, inter alia, declarations that Act 100 violates article XVI, section 2 and that future "skimming" will also be in violation of the constitution. Specifically, Trustees requested a declaration that,

*727 under [a]rticle XVI, section 2 of the Hawaii Constitution and applicable law, the State and its officers and agents are prohibited from skimming the ERS' investment earnings and from taking any other or further action that (a) will diminish, impair, or otherwise obligate the ERS' actuarial investment earnings; or (b) will reduce the [e]mployers' periodic contributions as determined by the [Trustees'] actuary in accordance with [c]hapter 88 and sound actuarial practice; or (c) otherwise will impair the contractual rights of the members[.]
(Emphasis added.) Trustees also alleged in their complaint that through the enactment of Act 100, the State had unlawfully "diminished and impaired" the ERS funds:
In retroactively diverting the 1997 and 1998 investment earnings from the ERS to the [State and Counties], the State unlawfully diminished and impaired the ERS funds; unlawfully denied the members the protection of the funds to which they are entitled as a matter of law; and unlawfully interfered with and impaired the discretion of the [Trustees] in the investment and reinvestment of the funds of the ERS.
Thus, the implementation of Act 100 does not preclude the injuries alleged in Trustees' claims from continuing to occur.

XXVII.
Further, this case falls within the "public interest" exception to the mootness doctrine.[23] As this court has stated, "when the question involved affects the public interest and an authoritative determination is desirable for the guidance of public officials, a case will not be considered moot." Slupecki v. Admin. Dir. of Courts, State of Hawai`i, 110 Hawai`i 407, 409 n. 4, 133 P.3d 1199, 1201 n. 4 (2006) (citations omitted). "Among the criteria . . . are [ (1) the public or private nature of the question presented, [ (2) ] the desirability of an authoritative determination for the future guidance of public officers, and [ (3) ] the likelihood of future recurrence of the question[.]" Yogi, 101 Hawaii at 58, 62 P.3d at 201 (Acoba, J., concurring) (quoting Johnston v. Ing, 50 Haw. 379, 381, 441 P.2d 138, 140 (1968)).
As to the first prong, there is alleged a matter of public interest at stake. As Plaintiffs argue, Act 100 "increased the [ERS'] unfunded liability, increasing the burden that is passed on to future generations of taxpayers and thus [made] it more likely that, as the employer contributions become more onerous for State and county governments, there will be further diversions or deferrals of contributions." Additionally, because all state and county employees obtain membership in the system upon employment, this involves a significant number of people. Thus, there is a matter of public interest sufficient to meet the first prong of the test. See id. (Acoba, J., concurring) (concluding that "[u]doubtedly, the public interest [was] involved" where plaintiffs included four unions representing 48,000).
As to the second prong, it is obvious that determination of the matter would assist public officers in the future. Id. at 58, 62 P.3d at 201 (Acoba, J., concurring). Plainly, *728 a decision in this case will assist executive officers and legislators in making budgetary decisions involving the benefits of public employees. Finally, the third prong of the test is met because even a cursory analysis of the ERS history shows that, over time, the State and counties have used funds owed to the ERS in order to address budgetary concerns. Id. (Acoba, J., concurring). Thus we reject the State's argument that Trustees' claim for declaratory relief is moot.

XXVIII.
In relation to the State's argument (5) that "this lawsuit involves `political questions' and is not justiciable[,]" the State maintains that "`the manner of funding the city's future obligations to its pension fund is a political decision ultimately reposed in the legislative branch of the city government[,]'" (quoting Cianci, 722 A.2d at 1198-99), and similarly, "how the `accrued benefits' of ERS members are funded requires `policy decisions that are primarily within the authority and expertise of the legislative branch[,]'" (quoting Office of Hawaiian Affairs v. State, 96 Hawai`i 388, 401, 31 P.3d 901, 914 (2001) [hereinafter, OHA]).
Trustees respond that "[t]he issue presented calls upon this [c]ourt to interpret the Hawaii Constitution, a task most appropriate to judicial action." Trustees rely on Waihee, and maintain that "`all constitutional interpretations have political consequences,'" and a court cannot reject "`a bona fide controversy as to whether some action denominated political exceeds constitutional authority unless the matter at hand has been committed to another branch of government[.]'" 70 Haw. at 262-63, 768 P.2d at 1285 (quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).
As noted, the State relies on Cianci, where the Rhode Island Supreme Court addressed the issue of "whether the council may actually fund part of the pension system on an annual basis and fund as another part . . . on a pay-as-you-go basis." 722 A.2d at 1197. In making its determination that there was a political question involved, the Cianci trial court observed that, "[i]n the absence of some overriding statutory directive from the General Assembly, or a Collective Bargaining agreement or some other contractual requirement, the City is free to fund its pension system in any manner it may wish[.]" Id. at 1197-98 (emphasis added). As noted previously, the Hawaii legislature also has "flexibility" in funding the ERS subject to the constitutional pension provision. However, unlike Cianci, which did not have a constitutional pension provision guiding its actions, here, the Hawaii legislature is not free, like the city in Cianci, to fund its system "in any manner" because it is restricted by article XVI, section 2 from diminishing or impairing retirement funds. See discussion infra.
Relying on OHA and Trs. of the Office of Hawaiian Affairs v. Yamasaki, 69 Haw. 154, 737 P.2d 446 (1987), the State essentially appears to argue that how the State chooses to fulfill its funding obligations to the ERS is a policy decision to be made by the legislature and, therefore, a political question. In response, Trustees assert that "the primary issue . . . is whether [a]rticle XVI, [s]ection 2 prohibits legislative raids on the ERS like that perpetuated through Act 100," a question "entirely within the purview of the court." Trustees further contend that the instant case is distinguishable from both Yamasaki and OHA because "[t]here is no `initial policy determination' this [c]ourt would have to make in this case with respect to [a]rticle XVI, [s]ection 2 that is normally reserved for the Legislature."
The constitutional mandate involved in those cases was "the establishment of a government agency with a primary goal `of the betterment of the conditions of native Hawaiians.'" OHA, 96 Hawai`i at 400, 31 P.3d at 913. The statutes at issue required that "twenty per cent of all funds derived from the public land trust . . . shall be expended by the [Office of Hawaiian Affairs] . . . for the purposes of this chapter[.]" See id. at 391, 400, 31 P.3d at 904, 913 (citing 1980 Haw. Sess. L. Act 273, at 521) (stating that "the invalidity of Act 304 reinstates the immediately preceding version . . . which then places this court precisely where it was at the time Yamasaki was decided").
*729 This court determined that "[it] would be encroaching on legislative turf because the seemingly clear language of HRS § 10-13.5 [ (1993) ] actually provides no `judicially discoverable and manageable standards' for resolving the disputes and they cannot be decided without `initial policy determination[s] of a kind clearly for nonjudicial discretion.'" Id. (quoting Baker, 369 U.S. at 217, 82 S.Ct. 691) (brackets omitted). OHA reiterated what had been said in Yamasaki, to the extent that there were many "uncertainties with respect to the ceded lands comprising the trust res and the funds derived therefrom." Id. at 400 n. 19, 31 P.3d 901, 31 P.3d at 913 n. 19 (quoting Yamasaki, 69 Haw. at 173-74, 737 P.2d at 457-58).
The instant case differs from the foregoing cases because determining whether Act 100 violates the constitution does not require an "initial policy" consideration. As Trustees argue, this case is similar to Waihee, where the plaintiffs sought "a declaration of the powers of the [Board] to formulate policy and exercise control over the public school system and the internal organization of management of that system.'" 70 Haw. at 262, 768 P.2d at 1285 (brackets omitted). This court stated that "[o]bviously a judicial declaration of the Board's powers under the constitution would have political repercussions`all constitutional interpretations have political consequences.'" Id. (quoting R. Jackson, The Supreme Court in the American System 56 (1955)).
However, this court explained that "a court cannot reject as `no law suit' a bona fide controversy as to whether some action denominated `political' exceeds constitutional authority[,]" id. at 262-63, 768 P.2d at 1285 (citing Baker, 369 U.S. at 217, 82 S.Ct. 691) (internal quotations omitted), "unless the matter at hand has been committed to another branch of government and a decision would compel the court `to make judgments not susceptible to the usual tools of judicial methodology[.]'" Id. at 263, 768 P.2d at 1285 (quoting K. Ripple, Constitutional Litigation 96 (1984)). Thus, Waihee determined that the case, like the instant one, involved "textual interpretation, which undoubtedly constitutes judicial fare[.]" Id. Similarly, then, the instant question of constitutional interpretation is not barred by the political question doctrine.

XXIX.

A.
In conjunction with the State's argument (6) that "Trustees' action against the State is barred by the doctrine of sovereign immunity[,]" the State maintains that (a) it may only be sued where it has "waived its sovereign immunity [and] only to the extent specified in [HRS c]hapters 661, 662, 673 and 674" (citing Pele Def. Fund v. Paty, 73 Haw. 578, 837 P.2d 1247 (1992); Waugh v. University of Hawaii, 63 Haw. 117, 621 P.2d 957, (1980)); (b) Trustees have not sued any State official comprising an executive department of the government; and (c) the sovereign immunity bar encompasses equitable claims including Trustees' claims for declaratory and injunctive relief.
As to the State's contentions (a) and (b), Trustees respond that their claim need not be brought under one of the chapters because "Hawai`i courts have recognized an express exception to the sovereign immunity doctrine for suits for prospective relief that are not tantamount to an award of damages" and "[i]n such cases, the inquiry into whether the State has consented to be sued . . . is irrelevant." (Citing Bush, 81 Hawai`i at 482 n. 10, 918 P.2d at 1138 n. 10.). Trustees further maintain that the State's reliance on Waugh is misplaced because "the Waugh [c]ourt was concerned with the basic rule of sovereign immunity that the State cannot be sued without its consent" and not the "express exception" related above.
As to the State's contention (c), Trustees reiterate that (1) "the Hawai`i Supreme Court has consistently differentiated between suits for prospective relief (e.g., injunctions) and retrospective relief (e.g., damages), finding that sovereign immunity only precludes the latter." (Citing Washington v. Fireman's Fund Ins. Cos., 68 Haw. 192, 198, 708 P.2d 129, 133-34 (1985); Paty, 73 Haw. at 601, 837 P.2d at 1262; Bush, 81 Hawai`i at 481-82, 918 P.2d at 1137-38.); (2) Helela v. State, 49 Haw. 365, 369-70, 418 P.2d 482, 485 *730 (1966), the State's authority for applying sovereign immunity to equitable claims, "was decided 30 years before Bush and clearly is no longer valid authority for such a sweeping proposition"; and (3) "Trustees' claims are entirely prospective and will have little, if any, ancillary effect on the State treasury if granted."

B.
As this court has repeatedly noted, "the federal immunity principles under the eleventh amendment to the United States Constitution are `relevant to our own principles of sovereign immunity'" and we have adopted the United States Supreme Court rule creating an exception to the sovereign immunity doctrine where a plaintiff seeks prospective relief unless that relief is "`tantamount to an award of damages for a past violation of law[.]'" Bush, 81 Hawai`i at 481, 918 P.2d at 1137 (quoting Paty, 73 Haw. at 609-10, 837 P.2d at 1266).
In previous cases, we have held that "the sovereign State is immune from suit for money damages, except where there has been a `clear relinquishment' of immunity and the State has consented to be sued." [Paty, 73 Haw. at 607, 837 P.2d at 1265 (citing Washington v. Fireman's Fund Ins. Co., 68 Haw. at] 198, 708 P.2d [at] 134 . . ., cert. denied, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 977 (1986)). This exception to sovereign immunity can be traced to Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Accordingly, we have adopted the rule in Young, which:
makes an important distinction between prospective and retrospective relief. If the relief sought against a state official is prospective in nature, then the relief may be allowed regardless of the state's sovereign immunity. This is true "even though accompanied by a substantial ancillary effect on the state treasury." However, relief that is "tantamount to an award of damages for a past violation of . . . law, even though styled as something else," is barred by sovereign immunity.

Id. (quoting Paty, 73 Haw. at 609-10, 837 P.2d at 1266 (footnotes and citations omitted)) (emphasis added).
However, "[s]imply asking for injunctive relief and not damages does not clear the path for suit. The United States Supreme Court has recognized that the difference between retrospective and prospective relief will not in many instances be that between day and night." Id. (quoting Ulaleo v. Paty, 902 F.2d 1395, 1399 (9th Cir.1990)) (internal quotation marks, other citations, and brackets omitted) (emphasis in original). In Bush, "[w]e decline[d] to adopt the federal courts' narrow view that a claim for relief based on past illegal action is necessarily `retrospective.'" Id. at 482 n. 9, 918 P.2d at 1138 n. 9 (citation omitted). Instead, we concluded that under our sovereign immunity doctrine, "the crucial inquiry . . . is whether the relief sought for a past violation of law is `tantamount to an award of damages' or would merely have an `ancillary' effect on the state treasury." Id. (quoting Paty, 73 Haw. at 609-10, 837 P.2d at 1266 (citing Papasan v. Allain, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986))) (emphasis added).
For example, in Paty, native Hawaiian beneficiaries of the ceded land trust sought to nullify a land exchange agreement between the State and a private estate via a constructive trust. The beneficiaries' constitutional claims included, inter alia, breach of trust claims under article XII, section 4, due process claims under article I, section 5, and a claim that the relinquishment of state lands violated article XII, section 7 of the Hawai`i Constitution. 73 Haw. at 611 n. 23, 837 P.2d at 1267 n. 23. This court, in concluding that the claims were barred by sovereign immunity, explained that the relief sought was "in effect a request for compensation for . . . past actions" by the government. Id. at 611, 837 P.2d at 1267. The relief sought would be "essentially equivalent to a nullification of the exchange and the return of the exchanged lands to the trust res" and "[t]he effect on the state treasury would be direct and unavoidable, rather than ancillary, because imposing a constructive trust on lands now held by [the purchaser] would require that the State compensate [the purchaser] for its property." Id. (citing U.S. Const. Amend. *731 V.; Haw. Const. Art. 1, § 20) (emphasis added) (internal quotation marks omitted).

1.
At the outset, all parties appear to agree that the State has not expressly waived sovereign immunity in this case. Additionally, Trustees make no claim for monetary damages. Instead, Trustees seek both declaratory and injunctive relief. The injunctive relief sought is not to enjoin Act 100, which has already been implemented, but to "to prohibit future skimming" and to prevent "[a] renewed pattern of legislative skimming." Based on the foregoing allegations, it appears that Trustees seek "prospective" relief based on the past action by the State in implementing Act 100.

2.
Thus, the relevant inquiry is "whether the relief sought for a past violation of law is `tantamount to an award of damages' or would merely have an `ancillary' effect on the state treasury." Bush, 81 Hawai`i at 482 n. 9, 918 P.2d at 1138 n. 9 (citations omitted). Similar to the situation addressed in Bush, "there is no direct and unavoidable effect on the state treasury" in the instant case. Id. at 481, 918 P.2d at 1137. The relief sought by Trustees would declare the actions by the legislature unconstitutional and enjoin the State from engaging in any future constitutional violations. Any possible effect on the state treasury is not direct, but only "ancillary," to the extent that the State would be prohibited from any future "skimming" from ERS funds. Trustees do not request damages, nor will they obtain any compensation. Thus, the "requested relief is not `a request for compensation for the past action[,]'" id. at 482, 918 P.2d at 1138 (quoting Paty, 73 Haw. at 611, 837 P.2d at 1267), by the legislature.

C.
As to the State's contention (b), the State maintains that "this [c]ourt has stated that `sovereign immunity may not be invoked as a defense by state officials who comprise an executive department of government when their action is attacked as being unconstitutional.'" (Quoting Paty, 73 Haw. at 607, 837 P.2d at 1265 (citation omitted)). Based on the latter, the State infers that because "Trustees have not sued any `state official' comprising an executive department of government, their action against the State is barred by sovereign immunity." In response, Trustees essentially assert "[t]hat [the Paty] holding recognizes that suits against state officials in their official capacity are really suits against the State, and that injunctions against such officials are really injunctions against the State."
In Paty, this court reiterated that sovereign immunity will not be a bar where governmental action is challenged as unconstitutional.
It is the unquestioned rule that the State cannot be sued without its consent or waiver of its immunity in matters "involving the enforcement of contracts, treasury liability for tort, and the adjudication of interest [sic] in property which has come unsullied by tort into the bosom of government." . . . [However,] sovereign immunity may not be invoked as a defense by state officials who comprise an executive department of government when their action is attacked as being unconstitutional.

Paty, 73 Haw. at 607, 837 P.2d at 1265 (quoting W.H. Greenwell, Ltd. v. Department of Land and Natural Resources, 50 Haw. 207, 208-09, 436 P.2d 527, 528 (1968)) (emphasis added). Although we have repeatedly noted that sovereign immunity will not bar claims against officials from the executive department, there is no indication from these cases that a suit against the State will be barred absent the naming of an executive department official, and the State does not cite to any additional case law that supports this proposition. Further as Trustees note, a suit against a state official acting in his official capacity is essentially a suit against the State. See id. at 601, 837 P.2d at 1262 (where the Pele Defense Fund brought suit against executive officials acting in their official capacities, the Defense fund had a right to bring suit under the Hawai`i Constitution to "prospectively enjoin the State"). Thus, Trustees' failure to name a State official in *732 its complaint will not, in and of itself, invoke the sovereign immunity doctrine.

XXX.
In relation to the State's argument (7), the State asserts that "Trustees' action against the State is barred by the [two]-year statute of limitations set forth in HRS § 661-5" inasmuch as "Trustees' action against the State, if cognizable at all, accrued on June 30, 1999 (the date that Act 100 took effect) and expired on June 30, 2001, two years later" and "Trustees did not file their action against the State until after June 30, 2001." HRS § 661-5 provides as follows:
Every claim against the State, cognizable under this chapter, shall be forever barred unless the action is commenced within two years after the claim first accrues; provided that the claims of persons under legal disability shall not be barred if the action is commenced within one year after the disability has ceased.
(Emphasis added.) Thus, HRS § 661-5 plainly creates a two-year statute of limitation on "claim[s] against the State, cognizable under [HRS chapter 661.]" The jurisdictional section of HRS chapter 661, HRS § 661-1 (1993), provides:

The several circuit courts of the State and, except as otherwise provided by statute or rule, the several state district courts shall, subject to appeal as provided by law, have original jurisdiction to hear and determine the following matters, and, unless otherwise provided by law, shall determine all questions of fact involved without the intervention of a jury.
(1) All claims against the State founded upon any statute of the State; or upon any regulation of an executive department; or upon any contract, expressed or implied, with the State, and all claims which may be referred to any such court by the legislature; provided that no action shall be maintained, nor shall any process issue against the State, based on any contract or any act of any state officer which the officer is not authorized to make or do by the laws of the State, nor upon any other cause of action than as herein set forth.
(Emphases added.)
As the State acknowledged in its January 10, 2003 motion for summary judgment, Trustees "are alleging in this lawsuit that Act 100 is unconstitutional as being violative of [a]rticle XVI, [s]ection 2 of the Hawai`i Constitution." (Emphasis added.) Trustees' constitutional claims are plainly not "founded upon any statute of the State; or upon any regulation of an executive department; or upon any contract" and were not "referred to [the] court by the legislature[.]" HRS § 661-1(1); cf. Vail v. Employees' Ret. Sys. of the State of Hawaii, 75 Haw. 42, 52-57, 856 P.2d 1227, 1233-36, (1993) (concluding that the statute of limitations contained in HRS § 661-5 was applicable to the plaintiff's claim founded upon a state statute, HRS § 88-42 (1993)). Thus, Trustees' claims are not "cognizable under [HRS chapter 661]," HRS § 661-5, and, therefore, are not subject to the statute of limitations set forth in HRS § 661-5. Accordingly, the State's argument (7) is rejected.

XXXI.
As to the constitutionality of Act 100, for the forthcoming reasons, we conclude that the framers of our constitution intended to emulate New York's pension provision and, as such, we hold that our constitutional non-impairment clause similarly protects not only system member accrued benefits, but also as a necessary implication, protects the sources for those benefits. See infra; see also Sgaglione v. Levitt, 37 N.Y.2d 507, 375 N.Y.S.2d 79, 337 N.E.2d 592, 594 (1975) (holding that "necessarily implied in this constitutional, albeit perhaps limited, protection of the underlying `contract' providing for benefits is the protection of the sources of funds for those benefits, whether by way of continuing contributions by employees, employers, or the reserve funds required to be maintained under the retirement plan" (emphasis added)). Because of this implied protection, Act 100 violated article XVI, section 2 by impairing the sources used to fund the constitutionally protected "accrued benefits."

*733 XXXII.
Trustees variously argue that (1) "[r]ecords from the 1950 Constitutional Convention show that [article XVI, section 2] . . . [was] introduced to ensure that the State and local governments would perform their statutory obligations to provide a sound retirement system for their employees," (2) the "[c]ourt erroneously granted the State's Motion for Summary Judgment," because "Act 100 constitutes a plain, clear, and manifest violation of [a]rticle XVI, [s]ection 2," as evidenced by the text itself and scrutiny of the intent of the framers of the Hawaii Constitution, (3) "Act 100 impaired the structural integrity of the ERS," (4) the "[c]ourt erroneously concluded that Act 100 did not constitute a failure to fund the ERS," (5) the "[c]ourt incorrectly applied its definition of `accrued benefits,'" and (6) case law from jurisdictions interpreting "similar constitutional provisions," support their position.
The State responds that "Act 100 is constitutional and the . . . Trustees cannot establish that it is contrary to or violative of [a]rticle, XVI, section 2 of the Hawai`i Constitution" because (1) "[t]he ERS is a `defined benefit' pension plan and members do not have a right to plan assets or a right to control the manner or method of funding their accrued benefits," (2) "[a]rticle XVI, section 2 of the Hawai`i Constitution does not concern funding of retirement benefits" (citing to Hawai`i constitutional debates and Illinois and Michigan case law), and (3) "[c]ases cited by the . . . Trustees from other jurisdictions have little persuasive value where they are founded on constitutional and statutory provisions that are different from ours."
Trustees reply that "Illinois and Michigan law are not persuasive." Trustees request that this court reverse the court's order granting summary judgment in favor of the State and instruct the court to grant summary judgment in favor of Trustees.

XXXIII.
Certain preliminary propositions are relevant. "This court reviews questions of constitutional law de novo, under the `right/wrong' standard, and, thus, exercises its own independent constitutional judgment based on the facts of the case." In re Guardianship of Carlsmith, 113 Hawai`i 236, 239, 151 P.3d 717, 720 (2007) (quoting State ex rel. Anzai v. City and County of Honolulu, 99 Hawai`i 508, 515, 57 P.3d 433, 441 (2002) (other citation omitted)). "`We have long recognized that the Hawai`i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional principle is to give effect to that intent.'" Save Sunset Beach Coal. v. City & County of Honolulu, 102 Hawai`i 465, 474, 78 P.3d 1, 10 (2003) (quoting Convention Center Auth. v. Anzai, 78 Hawai`i 157, 167, 890 P.2d 1197, 1207 (1995) (internal quotation marks and citations omitted)).
"`The general rule is that, if the words used in a constitutional provision . . . are clear and unambiguous, they are to be construed as they are written.'" Kelly v. 1250 Oceanside Partners, 111 Hawai`i 205, 223-224, 140 P.3d 985, 1003-04 (2006) (quoting Taomae v. Lingle, 108 Hawai`i 245, 251, 118 P.3d 1188, 1191 (2005) (citations omitted)). Furthermore, in interpreting a constitutional provision, "this court `may look to the object sought to be established and the matters sought to be remedied along with the history of the times and state of being when the constitutional provision was adopted.'" Id. at 225, 140 P.3d at 1005 (quoting City & County of Honolulu v. Ariyoshi, 67 Haw. 412, 419, 689 P.2d 757, 763 (1984) (citation omitted)). "[W]here it is alleged that the legislature has acted unconstitutionally, this court has consistently held that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest, and unmistakable." Watland v. Lingle, 104 Hawai`i 128, 133, 85 P.3d 1079, 1084 (2004) (internal quotation marks, brackets, ellipses, and citations omitted).

XXXIV.

A.
As to Trustees' first argument, the proceedings of the 1950 Constitutional Convention *734 demonstrate that article XVI, section 2 was introduced to ensure that the State and local governments would provide a sound retirement system for their employees, largely because of the Territory's past lapses in funding such benefits.
Delegate Trask who initiated discussion of the proposed provision stated, "I believe that the government employees are entitled to a constitutional protection of a system that has gone a long way in contributing to the welfare of our community." Proceedings of the Constitutional Convention of Hawai`i of 1950, Vol. 2 at 493 (emphasis added). Thereafter, Delegate Ohrt, the primary proponent of article XVI, section 2 (also referred to as the non-impairment clause or the pension provision), echoed these introductory comments and stated further:
I was interested in Proposal 129 which I think is the type of proposal that this Convention should adopt. The retirement system really gives protection to some 16,000 employees and fixes the benefits through a trust fund. That is, the retirement system has been set up as a trust fund, and as I understand it, there is a statutory contractual relationship at the present time, and I think the employees would like to see it as a constitutional contractual relationship.

Id. (emphases added).
However, the adoption of the non-impairment clause also faced some initial opposition. The Standing Committee on Taxation and Finance advised against the provision, believing that it "would interfere with the free action of the legislature who can take necessary action as the times may warrant, after they have had an opportunity to complete a careful review and analysis of the system and of the financial condition of the State." Standing Committee Report No. 44, in Proceedings of the Constitutional Convention of Hawai`i of 1950, Vol. 1 at 180. During the debates that followed, certain delegates echoed the Committee's concern about binding future legislatures to adequate funding of the pension system. Delegate Tavares stated that, "by making it a contractual relationship, we would be sewing up every future legislature to guarantee to put up enough money for this system forever and ever. . . . If we put this through we are saying until this and unless this Constitution is amended, we can't do anything else but keep it up." Proceedings of the Constitutional Convention of Hawai`i of 1950, Vol. 2, at 494.
Other delegates, however, expressed what ultimately proved to be the prevailing view, i.e., that the constitutional provision was needed in large part to ensure that the Hawai`i legislature continued to meet its funding obligation. Delegate Sakakihara explained that the provision was intended to protect government employees by strengthening the government's obligation to maintain and fund the retirement system:

I recall some 18 years ago when the legislature of the Territory of Hawai`i absolutely defaulted on their share of the contribution towards this obligation. As we all know, the retirement system is a sacred trust by the government of funds entrusted by the employees of this Territory and the counties. Unwise investments were then made by the then trustees of the retirement systems. I remember very, very much, because I was a member of the finance committee of that session of the legislature.
I say to you, that the employees of the county, City and County and the Territory today are by law required to become members of the retirement system as long as they are employed by the government. They have no choice. They have no alternative but to become a member of the retirement system. I feel very strongly that there should be a contractual relationship, there should be between the government, if the government desires to maintain this system in good faith with the employees of the government. As presented here by Delegate Ohrt, there are some 16,000 employees of the county, City and County and the Territory. What protection do these employees have? What assurance do they have after having been employed in the service of the government that this fund will be secure? What assurance do they have that the government will continue to put up its share toward this retirement fund?

*735 I recall the day when the actuary, Mr. Buck, was invited by the legislature and appeared before the legislature in joint session and actually advocated that that security should be given to the employees of this government who are members of the retirement system. This fund has grown to the extent of $45,000,000 and I feel very strongly, ladies and gentlemen, that this amendment should be adopted and that the government should in good faith keep their obligation with the employees of the territory. I am therefore very strongly in favor of incorporating this amendment in the Constitution.
Id. at 495 (emphases added).
In response, Delegate Ashford reminded the Convention that the system's actuary had "recommended further deposits in the fund by the Territory, holding up as a horrible example the complete breakdown of the system in New York." Id. (emphasis added). Delegate Ashford further stated, "I have no doubt at all that the constitutional provision was written into the Constitution of New York because it had broken down under the old system." Id. (emphasis added).
Delegate Tavares had expressed concern that the provision may have meant that "the legislature guarantees that no employee in the future will ever be given less benefits proportionately than the employees today and that the legislature guarantees to put all of the money necessary from now to forever to cover whatever the benefits may be[.]" Id. In response, Delegate Ohrt explained that the "benefits of which shall not be diminished or impaired," applied to the benefits of "all those that are now members of the system." Id. Delegate Ohrt further clarified that the existing members of the system "have made their contributions and the benefits are a fixed benefit plan. And it's just such a reduction or the impairment of those benefits that the employees should be concerned with." Id.

B.
In the delegates' view, an ERS member's constitutional right under article XVI, section 2 that the accrued benefits shall not be diminished or impaired is inextricably tied to protecting the source of such benefits.[24] Delegate Ohrt emphasized that the funding of the system was foremost in the delegates' minds:
TAVARES: . . . [D]oes the delegate interpret this provision to mean that it is also a contract by the legislature guaranteeing to put up every bit of money necessary in the future to make good these proposed benefits set forth in the present law?

OHRT: That would be my interpretation of it. Yes, I think the government employees should have that.

NIELSEN: . . . Has the government so far in the Territory put up all the money they should have put up?
OHRT: The answer to that would be yes.
NIELSEN: It seems to me in the `47 session, they didn't want to give you the funds to keep the security sound.
OHRT: Well, that's correct. There was an effort to delete certain funds but the legislature finally appropriated them.
TAVARES: Is it not true that we have some considerable amount yet that we owe that we haven't paid up for the reserves because we started [it] in 1925 with Territorial employees and had to make up all the back years ourselves without any contributions from the employees?
OHRT: That covers the amount that covers prior service [credit].
. . .
TAVARES: What is the balance now?

*736 OHRT: About $4,000,000, but that is funded. The Territory is paying that. I don't recall what the rate is but a certain percentage each year is being paid.
TAVARES: We have extended it once already, haven't we?
OHRT: Yes, and those are just the things that we are trying to avoid.

TAVARES: In other words, we are not up to date then in our obligations.

OHRT: No, insofar as prior service, we are not. That's right.

Id. at 495-96 (emphases added). As indicated by the delegates' debate, ERS funds must be secure in order to ensure that the ERS will be able to fulfill its obligations to its members into the future. Hence, the State's contention that "[a]rticle XVI, section 2 of the Hawai`i Constitution does not concern funding of retirement benefits" is not persuasive. Article XVI, section 2 must necessarily protect funding of the ERS. To hold otherwise would permit the State to jeopardize the security of the retirement system,  the very circumstance that the delegates of the 1950 Constitutional Convention expressly sought to prevent.

C.
Therefore, as described by the Committee of the Whole, the intent of article XVI, section 2 was in part to provide the legislature with the flexibility to "reduce benefits as to . . . persons already in the system in[]so[]far as their future services were concerned[,]" but "[i]t could not, however, reduce the benefits attributable to past services." Committee of the Whole Report No. 18, Journal of the Constitutional Convention of 1950, Vol. 1 at 330 (emphases added). As discussed above, in 1999, through Act 100, the legislature retroactively divested the ERS of $346.9 million worth of employer contributions for 1997, 1998, and 1999. 1999 Haw. Sess. L. Act 100, §§ 1, 9 at 368, 370 ("section 1 shall take effect retroactive to July 1, 1996"). This divestment related to the past services of ERS members during 1997, 1998, and 1999.[25]
Hence, the court was wrong in stating that "the dialogue started by Delegate Tavares and Sakakihara [at the 1950 Constitutional Convention] did address or raise certain concerns regarding the soundness of the system. But that appeared to address more of the obligation of the employers to fund the system, and this [c]ourt is not yet convinced that Act 100 is a refusal or a rejection of the State to fund" the system. It would be inconsistent with the delegates' statements and the Committee of the Whole report to conclude that the delegates intended to afford legislative flexibility to the extent that the legislature could ultimately diminish or impair the benefits already accrued and contractually guaranteed. That would be in direct conflict with the intent of the delegates in adopting the constitutional provision.

XXXV.

A.
In conjunction with Trustees' sixth argument, in order to achieve the goal of protecting the integrity of the ERS system, the delegates to the 1950 Constitutional *737 Convention, "The present system is patterned on the New York system and the New York Constitution has what is in Proposal No. 129." Proceedings of the Constitutional Convention of Hawai`i of 1950, Vol. 2, at 494 (emphasis added). Proposal No. 129, which ultimately became article XVI, section 2, stated in its original form, "Membership in the employees' retirement system of the State shall be a contractual relationship, the benefits of which shall not be diminished or impaired." Id. (emphasis added). Similarly, the New York Constitution states, "After July first, nineteen hundred forty, membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired." N.Y. Const. Art. 5, § 7 (emphasis added).
Later in the proceedings, Delegate Mau explained that in amending the Hawai`i Constitution to include Proposal No. 129, "we will not be violating any precedents; as a matter of fact, we would be following the great State of New York." Id. (emphasis added). Thereafter, Delegate Ohrt, in response to Delegate Heen's question regarding the similarity between the proposed language and the "language employed in the New York Constitution," explained that the language in Proposal No. 129 was "taken from the New York Constitution." Id. (emphasis added). Additionally, in response to a question regarding the necessity of a constitutional amendment, Delegate Ohrt explained,
I've seen a great deal of work here on the Convention floor. New York State has taken the leadership in this  in pensions, trying to save the taxpayers some money. This was done in 1938 in New York. It's functioning well and we think that we are entitled to the same protection. Now, our system is practically the same as the New York system.[[26]]
Id. at 497 (emphasis added).

B.
Shortly before the proceedings as to Proposal No. 129 were completed, the delegates added the word "accrued" before "benefits." In adding the word "accrued," the delegates did not express an intent to diverge from following the New York system which they had recently lauded numerous times, as discussed supra. Instead, the delegates only sought to indicate that there "can be no impairment of past benefits, but that [the] future benefits can be changed by the legislature[.]" Id. at 498 (emphasis added).
This is because as noted before, Delegate Tavares had expressed concern that the amendment would require the ERS to be continued perpetually. Id. at 497. Likewise, Delegate White was concerned that the amendment did not draw a clear distinction between past benefits and future benefits. Id. at 497-98. To alleviate this uncertainty and clearly differentiate between past and future benefits, Delegate Anthony "suggest[ed] that the word `accrued' be inserted before the word `benefits.'" Id. at 498. Delegate Anthony explained, "I was trying to get rid of the impasse and I think the insertion of the word `accrued' will do it." Id.
After the Chairman accepted the addition of "accrued," Delegate Anthony stated, "The purpose of the amendment will be to preserve the accrued benefits but still leave the legislature free as to the future. In other words, the fear that Delegate White and Delegate *738 Tavares had, I think, are met by this insertion." Id. at 499 (emphasis added). Delegate Tavares confirmed that the addition of "accrued" satisfied his initial concerns. Id. Delegate White did not object. Id.
Delegate Tavares further stated that the final version of the amendment agreed with Delegate Mau's interpretation of the amendment which was made prior to the addition of the term "accrued." Id. Delegate Mau's interpretation was that "the State can [at] any time cut out [the] retirement system, but those who belong to the system before it is terminated, their rights and the benefits accrued to them still remain under this provision." Id. at 498 (emphasis added). The Committee of the Whole incorporated this objective in its report stating,
It should be noted that the above provision would not limit the legislature in effecting a reduction in the benefits of a retirement system providing the reduction did not apply to benefits already accrued. In other words, the legislature could reduce benefits as to (1) new entrants into a retirement system, or (2) as to persons already in the system in[]so[]far as their future services were concerned. It could not, however, reduce the benefits attributable to past services. Further, the section would not limit the legislature in making general changes [to the] system, applicable to past members, so long as the changes did not necessarily reduce the benefits attributable to past services.
Comm. of the Whole Report No. 18, Journal of the Const. Cony. of 1950, Vol. 1, at 330 (emphases added). This court has previously adopted the Committee of the Whole's interpretation of the provision.[27]See Chun v. Employees' Ret. Sys., 61 Haw. 596, 606, 607 P.2d 415, 421 (1980) (accepting that "a member of the retirement system is entitled to the benefits available under the system that have been accrued by the member" and concluding that article XVI, section 2 "was meant to protect an employee from a reduction in accrued benefits").

XXXVI.

A.
The New York cases have established that the constitutional non-impairment clause protects not only system member benefits, but also the sources of funds for those benefits.[28] *739 See Sgaglione, 375 N.Y.S.2d 79, 337 N.E.2d at 594. As noted before, article V, section 7 of New York's constitution states, similar to article XVI, section 2, that "membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired."
Particularly apt to Trustees' argument is Sgaglione, which addressed a New York statute requiring the State comptroller to purchase $125,000,000 in bonds using the retirement funds from the State Employees' and the State Policemen's and Firemen's Retirement Systems. Id. New York statutes provide that the State Comptroller is the "trustee" of the retirement funds and is vested with discretion to invest such securities as are authorized by statute. Id. (citing Retirement and Social Security Law §§ 13, 313; State Finance Law, § 98) (emphasis added). The issue in Sgaglione was "whether the legislative device of mandatory investment of retirement funds entrusted to the charge of the State Comptroller, despite the obviously compelling and urgent stringency with which the city and State are faced, violates the constitutional nonimpairment clause." Id.
Sgaglione concluded that, "necessarily implied in this constitutional . . . protection of the underlying `contract' providing for benefits is the protection of the sources for those benefits, whether by way of continuing contributions by employees, employers, or the reserve funds required to be maintained under the retirement plan." Id. (emphases added). That court further noted that, "there is flexibility reserved to the Legislature, but it is not unlimited" and "[c]lose examination is therefore required of any radical change in means chosen to maintain the integrity and security of the sources from which the concededly protected benefits are to be paid." Id. at 83, 337 N.E.2d at 595.
Trustees also rely on McDermott v. Regan, 82 N.Y.2d 354, 604 N.Y.S.2d 890, 624 N.E.2d 985 (N.Y.App.1993). In that case, a newly enacted statute changed the funding method for several government pension funds. Id. at 84, 624 N.E.2d at 986. The fund at issue had been accumulated through an aggregate cost method which resulted in funding some benefits before they actually accrued. Id. at 86, 624 N.E.2d at 987. The new legislation, on the other hand, adopted a projected unit credit method which required that benefits need only be funded once they were "accrued." Id. The result of this change would be that "the contributions that have [already] been put into the [fund] exceed benefits actually accrued and become a so-called surplus which [was] returned to the governmental entity making the annual contribution." Id.
This allowed governmental entities to pay reduced contributions for a number of years as a way of dealing with the budget crises being experienced in New York State. Id. The New York court concluded that the legislation allowing the reduction of employer contributions violated the state constitution because it impaired the security of the pension fund and divested the funds' trustee of discretion in choosing appropriate funding methods.
Said legislation allows employers to deplete moneys in the existing pension fund by reducing the amount of employer contributions. Employers are allowed a credit of a portion of the existing moneys, and need not contribute to the pension until the reserved moneys are drastically reduced. To later replenish the fund, employers and employees must increase their contributions to the pension fund. As such, the reserve moneys will not be available for immediate investment, the return on investment of the moneys in the existing fund will be significantly decreased, and the additional security provided by the reserve moneys in the pension funds will be impaired.

Id. at 894-95, 624 N.E.2d at 989-90 (emphasis added).
*740 In concluding that the legislation violated the non-impairment clause, it was said that, to the extent that "the Legislature maintains some independent authority regarding the fund . . . [,] concomitant with that authority is the State's duty to act in a manner consistent with the goal of the `protection' of these funds as required by article V, § 7 of New York's Constitution. The State must show like any other trustee or fiduciary, that it has not breached that duty." Id. at 894, 624 N.E.2d at 989. It was uncontroverted that "the only factor the Legislature considered when it chose to alter the funding method was that of the fiscal crisis facing the state." Id. Significantly, the New York court found the legislation unconstitutional despite the New York System's projected actuarial soundness.[29]Id. at 892, 624 N.E.2d at 987.
Further, as the New York court reiterated in McCall v. State, 219 A.D.2d 136, 142, 640 N.Y.S.2d 347 (1996), implicit in New York's constitutional pension provision providing that "pension benefits shall not be impaired[,]" is a protection of the "funds from which these benefits are drawn[.]" Id. McCall examined a statute which, inter alia, "grant[ed] State and municipal employers a credit to be assessed against the [Supplemental Reserve Fund (SRF)], equal to the amount of the contributions they would otherwise have had to make[.]" Id. at 139, 640 N.Y.S.2d 347 (emphasis added).
The New York appellate court determined that although the SRF was, arguably, "a separate fund" and not used to pay employee benefits, it was "indisputably an asset of the retirement system[,]" and was subject to the power of the trustee "to hold, manage and invest the assets contained therein for the benefit of the members and beneficiaries of the retirement systems, and for the protection of the taxpayers." Id. at 140, 640 N.Y.S.2d 347 (citations omitted). That court stated that pension beneficiaries are entitled to protection of the benefit funds and the independent judgment of the benefit manager to "maintain[] the security of the sources of the benefits."
[I]mplicit in the Constitution's assurance that pension benefits shall not be impaired, that the funds from which whose benefits are drawn are to be protected, and that pension beneficiaries are entitled to the independent judgment of the Comptroller in managing the systems' assets, as a "safeguard integral to the scheme of maintaining the security of the sources of the benefits."
Id. at 140, 640 N.Y.S.2d 347 (quoting Sgaglione, 375 N.Y.S.2d 79, 337 N.E.2d at 594). Further, that court said that "an infringement such as that occasioned [by legislation at issue] is constitutionally impermissible." Id. (citing McDermott, 82 N.Y.2d 354, 604 N.Y.S.2d 890, 624 N.E.2d 985).

B.
As Trustees maintain, Act 100 similarly "violates the non-impairment clause of the Hawai`i Constitution." By retroactively applying the ERS' excess earnings as a credit to employer contributions, Act 100 depleted the protected funds of the ERS and interfered with Trustees' ability to invest those funds. As Trustees argue, they were "entitled to manage one hundred percent of the ERS investment earnings from 1997 on" and "[t]he passage of Act 100 changed the commitments reflected in Act 327, which retroactively denied [T]rustees use of investment earnings, minimized employer contributions and further exacerbated the unfunded liability."
The Sgaglione court held that where the State comptroller was responsible for retirement investments, mandating the purchase of particular municipal bonds, which may or may not have been a prudent investment, constituted a constitutional violation. 375 N.Y.S.2d at 89, 337 N.E.2d at 599. Likewise, actions tantamount to removing funds from *741 the ERS would constitute a violation of our constitution.[30] Similar to Sgaglione and McDermott, Act 100 impaired the source of the funds needed to maintain the security of ERS members' benefits.[31] Further, like McCall, Act 100 diverted money designated to fund the ERS, thus depriving Trustees of their power to manage and invest the assets of the system and, hence, impairing the source of the funds and the integrity of the system in violation of article XVI, section 2 of our constitution.

XXXVII.
In relation to Trustees' sixth argument and the State's third argument, other jurisdictions support Trustees' position.

A.

1.
Alaska's constitutional pension provision is nearly identical in wording and substance to Hawaii's provision. Article XII, section 7 of the Alaska Constitution states, "Membership in employee retirement systems of the State or its political subdivisions shall constitute a contractual relationship. Accrued benefits of these systems shall not be diminished or impaired." (Emphasis added.) Hence, Alaska's case law is instructive in interpreting our own clause.
Alaska adopted the New York constitutional model a few years after Hawai`i did and added the word "accrued" before the term "benefits." See Hammond v. Hoffbeck, 627 P.2d 1052, 1057 n. 7 (Alaska 1981). Despite this addition, Alaska has generally interpreted its provision in line with New York case law. See id. at 1057 n. 8 (explaining that "[t]he New York Constitution contains a similar provision [to Alaska's pension provision], which has been similarly interpreted by the New York courts." (citation omitted)).
In Hammond, the Alaska court addressed amendments to the statutory scheme underlying the Alaska Public Employees' Retirement System (PERS) that reduced members' occupational death and disability benefits, and excluded some persons who were previously eligible. Id. at 1053. One issue in Hammond was whether benefits vest upon employment or enrollment or only when an employee becomes eligible to receive such benefits. Id. at 1055.
First, the court noted that "the phrase `accrued rights' is synonymous with vested rights."[32]Id. at 1055 n. 4 (citing Bidwell v. *742 Scheele, 355 P.2d 584, 586 (Alaska 1960)) (emphasis added). Next, it determined that "the benefits under PERS are in the nature of deferred compensation and the right to such benefits vests immediately upon an employee's enrollment in that system." Id. at 1057, see id. at 1057 n. 7 (analyzing the commentary accompanying the enactment which reads, "This will assure state and municipal employees who are now tied into various retirement plans that their benefits under these plans will not be diminished or impaired when the Territory becomes a state" (citing 6 Proceedings of the Alaska Constitutional Convention, Appendix V (Committee Proposals & Commentary) at 140 (1955) (emphasis added))). See also Municipality of Anchorage v. Gallion 944 P.2d 436, 440-441 (Alaska 1997) (affirming that the right to benefits vests when the employee enrolls in the retirement system rather than when the employee is eligible to receive the benefits); Kraus v. Bd. of Trustees of Police Pension Fund, 72 Ill.App.3d 833, 28 Ill.Dec. 691, 390 N.E.2d 1281, 1289 (1979) (holding that even in Illinois, right to such benefits vests upon enrollment and stating that "[t]he purpose of the amendment was to fix the rights of the employee at the time he became a member of the system").
Trustees cite to Gallion, which addressed the funding of the Anchorage Police and Fire Department System (APFRS). 944 P.2d at 437-38. The system consisted of three separate plans, each with different members, different benefits and different eligibility requirements. Id. at 438. A statute allowed funds to be diverted from two of the plans that were overfunded to the third plan that was underfunded. The members asserted that the ordinance impaired the retirement system's ability to enhance benefits for Plan I and II members and weakened the financial integrity of both of the latter plans. Id. at 439-40. The Municipality of Anchorage argued that the ordinance was constitutional because Plans I and II were defined benefit plans and if contributions fell short the plan members could not reasonably expect to receive any portion of the accumulated surplus of Plans I and II. Id. at 440.
The Alaska Supreme court nevertheless held that the ordinance was unconstitutional because it "impair[ed] the vested right of members of Plans I and II to have the actuarial soundness of those plans evaluated and maintained separately without being affected by the soundness of other plans" and that "[t]hat failure impairs the ability of Plans I and II to withstand future contingencies, such as increases in plan obligations, declines in investment revenue and inability by [Municipality of Anchorage] to fund any shortfall." Id. at 444. Trustees further note that the court found the ordinance unconstitutional even though "there was no suggestion in Gallion that any current benefits due existing retirees were being diminished." Thus, the Alaska court's determination of unconstitutionality lay not in a finding that the plan had become actuarially unsound (it had not) but in the finding that the system features had been altered in a way which could have adverse consequences in the future.[33]

2.
Alaska's constitutional provision very closely resembles our own and, second, just as the Hawai`i delegates intended to emulate New York's pension provision, Alaska has generally interpreted its provision in line with New York case law. See supra. Further, although the facts in Gallion differ *743 somewhat, inasmuch as the instant case concerns one plan whereas the Alaska court was examining three, Gallion's reasoning is still pertinent. The instant case is similar to Gallion in that there is no indication that current benefits would not be paid out; nevertheless the Gallion court found impairment because "the ability of the plans to withstand future contingencies" was affected. Here, assuming, arguendo, the ERS is actuarially sound, it was weakened by Act 100 and could be adversely affected in the future.
The dissent maintains that our reliance on Gallion for this proposition "is speculative and does not address the issue whether the accrued benefits were diminished or impaired." Dissenting opinion at ___, 162 P.3d at 752. Contrary to the dissent's contention, it is unmistakable, and not speculative, that the substantial divestiture of $346.9 million from the ERS risks adverse consequences in the future, even assuming the actuarially soundness of the present system. See Gallion, 944 P.2d at 440-41. To reiterate, as evidenced by the ERS Financial Reports, Act 100 has, at least, negatively contributed to the large unfunded actuarial liability of the ERS, has stripped the ERS of investment opportunities, and has prevented the ERS from "establishing a rainy day fund for the years of poor investment returns." See supra.

B.
California lacks a state constitutional pension provision.[34] However, the California courts have concluded that accrued benefits of public employees as well of the sources of those benefits must be protected. In Valdes v. Cory, 139 Cal.App.3d 773, 189 Cal.Rptr. 212, 220 (1983), the California Court of Appeals explained that parallel to the U.S. Constitution,[35] the California Constitution prohibits the state from passing a law impairing the obligation of contracts. Article I, section 9 of the California Constitution states, "A law impairing the obligation of contracts may not be passed." According to Valdes, under well-settled principles, these contract clauses limit the power of a state to modify its own contracts with other parties. Id. While some jurisdictions view employees' retirement rights as a gratuity, "a long line of California decisions establishes that `[a] public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not *744 be destroyed, once vested without impairing a contractual obligation of the employing, public entity.'"[36]Id. at 221 (quoting Betts v. Bd. of Admin., 21 Cal.3d 859, 148 Cal.Rptr. 158, 582 P.2d 614 (1978)). Thus, although the California Constitution does not contain a non-impairment pension provision, the case law there affords protections similar to Hawaii's constitution.
Valdes examined emergency legislation that allowed the state to suspend contributions to the California Public Employees Retirement System (Cal. PERS). Id. at 212. According to the Conference Committee Report, the legislation, which eliminated "three months of state and school-employer contributions to the [Cal.] PERS would result in a total savings to the state general fund of $180 million ($105 million in state contributions for state employees and $75 million in state contributions for school employees)" and would result in "a corresponding diminution in the PERS reserve against deficiencies account, currently estimated by the chief actuary of the PERS to contain approximately $950 million." Id. at 217 (citing Conf. Comm. Report on Assembly Bill 1253). Additionally, "[n]o provision [was] made for future replacement of this amount in the reserve account." Id.
In determining that the said legislation was unconstitutional, the appellate court reasoned that although the state's action had not reduced employee benefits under the system, the state could not suspend or reduce its statutorily defined contributions "absent actuarial input" to ensure that the system would remain actuarially sound. Id. at 223. That court further stated that even if an employee had not suffered any out-of-pocket expenses, "the interest . . . at issue here is in the security and integrity of the funds available to pay future benefits." Id. at 222 (emphasis added).[37]
Finally, the California court declared that the State's financial crisis could not be an influencing factor in its decision.
We do not question the good faith of the Legislature in enacting chapter 115 and we presume that it harbors no intent inadequately to fund PERS. [(citation omitted.)] We nonetheless conclude that the Legislature's rescission of existing appropriations for employer contributions . . . substantially impairs public employees' assurance that they will ultimately receive the retirement benefits to which they become entitled.

Id. at 225 (emphasis added) (citation omitted). Valdes stated that "[t]he loss of a $187 million appropriation to the retirement fund, together with the potential long[]term investment yield therefrom is not inconsequential." Id. As in the instant case, there were no out-of-pocket losses to the employees in Valdes, but the California court nevertheless held that impairment to the source of the benefits constituted a constitutional impairment of the employees' vested rights. Id. at 222.[38]

*745 C.
As noted, the courts, in interpreting their respective state constitutional pension provisions, have not been unsympathetic to the plight of the legislature in the midst of a financial crisis. However, as Sgaglione stated, "[t]he courts did not make the Constitution; [and] the courts may not unmake the Constitution". 375 N.Y.S.2d 79, 337 N.E.2d at 596. While we recognize that difficulties faced by the legislature in the midst of a budget crisis are palpable, this court cannot be compelled to alter or amend the constitution.

XXXVIII.

A.
Thus, in connection with Trustees' second and third argument, the court was wrong in granting the State's motion for summary judgment as to the Trustees because Act 100 violated article XVI, section 2. While Act 327 of the 1997 legislative session allowed the ERS to retain all of its investment earnings in exchange for the elimination of the employers' obligation to make up shortfalls in the investment yields, Act 100 eliminated the ERS' right to retain all of its investment earnings without requiring the employers to make up the shortfalls in investment yields. Act 327 relieved the government employers of their obligation to make up a $99.4 million shortfall. Act 100 deprived the ERS of the balancing right to retain all of its investment earnings, and designated those excess earnings as a further offset against additional employers' contributions.
As to the reduction in employers' contributions, according to ERS actuaries, "in 1997, rather than contributing the $179.3 million that the actuary found necessary, the public employers contributed $22.4 million. In 1998, rather than the actuarially-mandated $164.4 million, the public employers contributed $8.1 million. And in 1999, rather than the required $201.2 million, the employers contributed $167.5 million." In sum then, according to ERS actuaries, Act 100 caused a $346.9 million retroactive reduction in employers' contributions, not including potential investment earnings.

B.
Manifestly, this reduction under Act 100 "impair[ed]" the retirement system in violation of article XVI, section 2 of the Hawai`i Constitution.[39] During 1997, 1998, and 1999, ERS members accrued benefits and contributed funds to their ERS pension plans. Also during 1997, 1998, and 1999, under Act 327, employers were required to make certain contributions. However, Act 100 caused a $346.9 million shortfall in the employers' contributions for 1997, 1998, and 1999, and, thus, the fund from which ERS members were to receive their accrued benefits following retirement was reduced by $346.9 million that should have been paid into the fund.[40]
As indicated previously, the 2002, 2003, 2004, and 2005 ERS Financial Reports indicate that because of the legislature's diversion of excess investment earnings, the ERS has continued to suffer a large unfunded actuarial liability which in turn has and continues to diminish the investment opportunities available to the ERS, and prevents the ERS from "establishing a rainy day fund for *746 the years of poor investment returns." See ERS Financial Report For the Fiscal Year Ended June 30, 2002, at 4 (Dec.2002); ERS Financial Report For the Fiscal Year Ended June 30, 2003 at 4 (Dec. 8, 2003); ERS Financial Report For the Fiscal Year Ended June 30, 2004 at 9 (Dec. 13, 2004); ERS Financial Report For the Fiscal Year Ended June 30, 2005 at 5 (Dec. 29, 2005).
Specifically, the 2002 ERS Financial Report reveals that "[t]he use of ERS investment earnings to help balance the State and county governments' budget and the negative investment returns over the past two years primarily contributed to the increase of the unfunded accrued liability [of the ERS]." ERS Financial Report For the Fiscal Year Ended June 30, 2002, at 4 (Dec.2002). The 2003 ERS Financial Report shows that in 2003, there was concern over the increased "unfunded accrued liability" which primarily resulted from "negative investment returns over the prior two years." ERS Financial Report For the Fiscal Year Ended June 30, 2003, at 4 (Dec. 8, 2003).
The 2004 ERS Financial Report reiterated that the ERS' large "unfunded actuarial accrued liability [was] primarily the result of unfavorable investment returns in FY 2001 and FY 2002" and also because of "the previous use of the ERS' excess investment earnings to reduce State and county government contributions to the ERS." ERS Financial Report For the Fiscal Year Ended June 30, 2004 at 9 (Dec. 13, 2004). Finally, the 2005 ERS Financial Report illustrates that despite "positive earnings, [in 2005,] the actuarial funded ratio declined[,] . . . primarily [as a] result of the past diversion of excess investment earnings which prevented the ERS from establishing a rainy day fund for the years of poor investment earnings." ERS Financial Report For the Fiscal Year Ended June 30, 2005 at 5 (Dec. 29, 2005).
Therefore, it is "plain, clear, manifest, and unmistakable[,]" Watland, 104 Hawai`i at 133, 85 P.3d at 1084 (internal quotation marks, brackets, ellipses, and citations omitted), that the $346.9 million reduction in employer contributions unconstitutionally impaired the pension system.[41]

XXXIX.

A.
In conjunction with its first argument in response, the State argues that the "ERS is a `defined benefit'[[42]] pension plan and members do not have a right to the plan assets or a right to control the manner or method of funding their accrued benefits." The State further asserts that "[t]he amount of the member's `accrued benefit' is not affected by, determined by, or dependent on the size of the fund accumulated in advance, the amount of the employer's contribution in any given year or the investment return on such funds." According to the State, "[a] member of a `defined benefit' pension plan has a right only to the `accrued benefit' defined by the plan."
*747 It appears that the crux of the State's argument is that because the members have no right to share in the plan's surplus, there is no impingement on the constitutionally protected "accrued benefits." This issue was addressed by the Alaska Supreme Court in Gallion. In that case, the Municipality of Anchorage argued that "because these are defined benefit plans members have no right to share or reasonable expectation of sharing in any surplus created by overcontributions or investment success." Gallion, 944 P.2d at 443.
The Alaska court responded that, "[c]onsequently, whether or not members of Plans I and II expected when they enrolled to share in any surplus by an increase in benefits, they reasonably could have expected that the product of their contributions would be used for their ultimate benefit. Certainly they could not have expected that any surplus would be used for the benefit of non-plan members." Id. (emphasis added). Similarly, under article XVI, section 2 as construed supra and as contemplated by the delegates, ERS members are entitled to a structurally sound system and could "expect[] the product of their contributions would be used for their ultimate benefit." Id. To in effect, remove money to deal with a budget shortfall, rather than assigning funds for the ultimate benefit of the members would affect their interests in an injurious manner.

B.
The dissent points to Kraus, for the proposition that Hawaii's constitutional provision is "in significant contrast to the New York provision." Dissenting opinion at ___, 162 P.3d at 751 (quoting Kraus, 28 Ill.Dec. at 701, 390 N.E.2d at 1291). However, the dissent's reliance on Kraus is misplaced and taken out of context to some extent. First, Kraus, discussing the Illinois provision, points out that, at the time of the Illinois convention, New York, Alaska, Hawai`i, and Michigan had adopted pension provisions in their constitutions, and all but New York used the term "accrued benefits[.]" 28 Ill.Dec. at 701, 390 N.E.2d at 1291. Kraus acknowledged that Alaska and Hawai`i had yet to construe its provisions and in Michigan "the matter is not free from all doubt[.]"

Although no cases construing this language have been reported in Alaska or Hawaii, the courts in Michigan have construed their pension provision. While the matter is not free from all doubt . . . it appears likely that the use of the word "accrued" signifies that pension rights do not vest until retirement.
Id. (citations omitted) (emphases added).
As the Kraus court noted, at the time of its publication, we had not interpreted our own pension provision and neither had Alaska. Only Michigan had any case law on the subject and as Kraus noted, interpretation of that case law was "not free from all doubt." See id. (stating, "Compare In re Enrolled Senate Bill 1269, . . . [389 Mich. 659,] 209 N.W.2d 200 (1973) (legislature can attach new conditions, such as increased contributions, for earning unaccrued benefits) [w]ith Detroit Police Officers Ass'n v. City of Detroit, . . . [391 Mich. 44,] 214 N.W.2d 803, 816 (1974) ([stating that] . . . `those already covered by a pension plan are assured that their benefits will not be diminished by future collective bargaining agreements'))."
Ostensibly based on this inconclusive Michigan case law, the Illinois Appellate court concluded that "the use of the word `accrued' [likely] signifies that pension rights do not vest until retirement." Id. It reached this conclusion with little analysis, apparently deciding that the addition of the word "accrued" made these provisions significantly different from New York even though the only court that had interpreted its "accrued benefits" provision, Michigan, had not conclusively reached the same determination. Of course, Kraus is not binding on this court.
Moreover, because its conclusion as to the term accrued rested on Michigan law that was admittedly "not free from all doubt," id., Kraus carries little weight. Also, as noted, Alaska has since interpreted a provision substantively identical to Hawai`i in line with New York case law. See supra. Thus, the dissent's reliance on Kraus is misplaced because (1) its interpretation of our constitution was based on inconclusive law from one state, (2) Kraus was proven inconsistent by subsequent *748 case law from Alaska determining that the term "accrued benefits" does not mandate the provision be interpreted in "significant contrast" with the New York provision, and (3), as noted previously, the legislative history of our provision shows that the Hawai'i delegates to the 1950 Convention intended to follow the New York provision; New York case law is therefore relevant and should be given "heavy weight" as Trustees propose.

C.
In conjunction with its second argument, the State points to cases from Illinois[43] and Michigan as support for the proposition that "the framers of Hawaii's Constitution did not intend that [a]rticle XVI, [s]ection 2 control or dictate the means, method or manner by which state or county employees' retirement systems are funded." As Trustees note, both of these jurisdictions interpret their provisions only to require that employees receive the money they are due at the time of retirement. See, e.g., People ex rel. Illinois Fed'n of Teachers v. Lindberg, 60 Ill.2d 266, 326 N.E.2d 749 (1975).

1.
In the Illinois cases cited by Trustees, the courts of that state concluded that the "tenor of the debates was concerned with protecting employee benefits, not funding." McNamee, 220 Ill.Dec. at 149, 672 N.E.2d at 1161. McNamee, which overturned a lower court decision that relied heavily on McDermott, determined that "the clearly expressed intentions of the framers of the Illinois Constitution must control over any discordant interpretation from a sister state." Id. at 153, 672 N.E.2d at 1165. The Illinois court closely examined transcripts from the constitutional debates[44] and concluded that "the framers of our constitution acknowledged that the New York provision was broader than the provision proposed in Illinois[.]" Id. For the reasons noted supra, Hawai`i chose to follow the broader New York model. Further, where the Hawai`i delegation was concerned with both funding, protection of benefits, and the system's integrity, Illinois was primarily concerned that its constitutional provision protect employees' right to benefits as they become due.
The State also cites to Sklodowski v. State, 182 Ill.2d 220, 230 Ill.Dec. 884, 889, 695 N.E.2d 374, 379 (1998), for the proposition that "there is no vested contractual or constitutional right for beneficiaries to enforce the level of state contributions." Although that court reaffirmed that the Illinois provision "creates an enforceable contractual relationship that protects only a right to receive *749 benefits," id. at 888, 695 N.E.2d at 378 (internal quotation marks and citations omitted), it observed that even in Illinois "a beneficiary need not wait until benefits are actually diminished to bring suit under the clause" and under-funding could be sufficient to constitute an impairment of benefits, id. at 889, 695 N.E.2d at 379. The Convention delegates' intent in adding article XVI, section 2 to the Hawai`i Constitution is plainly distinguishable from the purpose of the Illinois pension protection clause. As discussed supra, the delegates to the Hawai`i Constitutional Convention were concerned with providing a sound retirement system for state and county employees.

2.
The State also refers to article IX, section 24 of the Michigan Constitution which states "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof, which shall not be diminished or impaired thereby." In Kosa v. Treasurer of the State of Michigan, 408 Mich. 356, 292 N.W.2d 452 (1980), the Michigan court also relied on comments from its constitutional debates.[45] The history of the Michigan provision indicates that its framers purposefully worded the constitutional provision to reflect an intent that only benefits and not funding be protected. As the delegates noted, "It is not intended that an individual should . . . be given the right to sue the employing unit to require the actuarial funding of past service benefits. . . . What it is designed to do is to say that when his benefits come due, he's got a contractual right to receive them." Id. at 452 n. 12 (citation omitted). As noted supra, the history of Hawaii's non-impairment clause does not indicate any similar intent of limiting the non-impairment clause to the protection of benefits.

XXXX.
Based on the foregoing, as to Plaintiffs, the court's June 24, 2003 final judgment entered in favor of the State and against the Plaintiffs is remanded to the court with instructions to enter an order dismissing the Plaintiffs' claim for lack of jurisdiction. See Mottl, 95 Hawai`i at 383, 23 P.3d at 718. As to Trustees, the court's June 24, 2003 judgment is vacated and remanded. The court is instructed to enter summary judgment against the State and in favor of Trustees on Trustees' declaratory judgment claim that Act 100 violated article XVI, section 2 of the Hawai`i Constitution. See Univ. of Hawai`i, 102 Hawai`i at 443-44, 77 P.3d at 481-82. Trustees' other claims for declaratory relief raised in Trustees' complaint are remanded to the court for disposition as appropriate. As previously stated, the injunctive relief sought by Trustees shall not issue under the circumstances of this case. See Rees, 113 Hawai`i at 459, 153 P.3d at 1144.
Dissenting Opinion by MOON, C.J., in which LEVINSON, J., joins.
My departure from the majority stems from my disagreement with the majority's conclusion that Act 100 violates article XVI, section 2 of the Hawai`i Constitution. I, therefore, respectfully dissent.
I cannot agree with the majority's conclusion that the ERS trustees have carried their "burden of showing unconstitutionality beyond a reasonable doubt." Watland v. Lingle, 104 Hawai`i 128, 133, 85 P.3d 1079, 1084 *750 (2004) (citation omitted). What is troubling about the aforementioned conclusion is that the majority's analysis in its entirety essentially disregards this court's well-established rules of constitutional construction, to wit, that, "with the exception of statutes that classify on the basis of suspect categories, . . . every enactment of the legislature is presumptively constitutional," State ex rel. Anzai v. City & County of Honolulu, 99 Hawai`i 508, 515, 57 P.3d 433, 440 (2002) (internal quotation marks and citation omitted), and that "all doubts must be resolved in favor of the act," State ex rel. Amemiya v. Anderson, 56 Haw. 566, 574, 545 P.2d 1175, 1181 (1976) (internal quotation marks and citation omitted). Instead, the majority treats Act 100 as presumptively un constitutional and resolves all doubts against Act 100.
Article XVI, section 2 of the Hawai`i Constitution provides in its entirety:
Membership in any employees' retirement system of the State or any political subdivision thereof shall be a contractual relationship, the accrued benefits of which shall not be diminished or impaired.
Haw. Const. art. XVI, § 2 (emphasis added). Pursuant tp the plain language of article XVI, section 2, membership in the ERS establishes a "contractual relationship" between the members and the ERS and the members' "accrued benefits" from that relationship "shall not be diminished or impaired." This court has previously construed article XVI, section 2 in Chun v. Employees' Retirement System, 61 Haw. 596, 607 P.2d 415 (1980), wherein it accepted the Committee of the Whole's interpretation of the subject provision. Id. at 606, 607 P.2d at 421. The Committee of the Whole explained the intent of article XVI, section 2 as follows:
It should be noted that [article XVI, section 2] would not limit the legislature in effecting a reduction in the benefits of a retirement system provided the reduction did not apply to benefits already accrued. In other words, the legislature could reduce benefits as to (1) new entrants into a retirement system, or (2) as to persons already in the system in so far [sic] as their future services were concerned. It could not, however, reduce the benefits attributable to past services. Further, the section would not limit the legislature in making general changes in a system, applicable to past members, so long as the changes did not necessarily reduce the benefits attributable to past services.

Comm. of the Whole Report No. 18, 1 Proceedings of the Constitutional Convention of Hawai`i at 330 (1950) (emphases added); see Chun, 61 Haw. at 605-06, 607 P.2d at 421. This court stated that:
The Committee of the Whole's interpretation of [article XVI, section 2], which we accept, indicates that a member of the retirement system is entitled to the benefits available under the system that have been accrued by the member. From the Committee of the Whole Report, we conclude that [article XVI, section 2] was meant to protect an employee from a reduction in accrued benefits. However, the extent of such benefits as well as the conditions under which an employee should receive benefits, are governed by applicable statutory provisions[.]
Chun, 61 Haw. at 606, 607 P.2d at 421 (emphases added).
The majority states that "the delegates to the 1950 Constitutional Convention clearly manifested the intent to adopt and follow the then New York system." Majority op. at ___, 162 P.3d at 736. Specifically, the majority states that, "[i]n adding the word `accrued,' the delegates did not express an intent to diverge from following the New York system which they had recently lauded numerous times[.] Instead, the delegates only sought to indicate that there `can be no impairment of past benefits, but that [the] future benefits can be changed by the legislature[.]'" Majority op. at ___, 162 P.3d at 737 (third and fourth set of brackets in original) (citation and emphases omitted).
I submit, however, that the majority's view blurs the distinction between the "system" itself and the constitutional protection of that system. Although the delegates did not express an intent to depart from following the New York system, the delegates ultimately refrained from adopting New York's constitutional protection of the system. Specifically, *751 the delegates indicated that Hawaii's system at the time of the 1950 Constitutional Convention was "practically the same as the New York system. It's based on the same formula, one-seventieth for each year of service. It's a formula plan. It varies with the number of, years of service." Comm. of the Whole Debates, 2 Proceedings of the Constitutional Convention at 497 (1950) (emphasis added). However, the delegates ultimately refrained from adopting New York's constitutional protection of the system by rejecting the purported New York-based initial provision (i.e., Proposal No. 129) to a significant extent by inserting the word "accrued" before the word "benefits." Consequently, I believe that the delegates significantly modified the purported New York-based initial provision. Cf. Kraus v. Bd. of Trs. of Police Pension Fund of Village of Niles, 72 Ill. App.3d 833, 28 Ill.Dec. 691, 701, 390 N.E.2d 1281, 1291 (1979) (stating that, "if the constitutional convention had intended to depart from the New York construction, presumably the terms of the provision would have been changed so as to effectuate that intent") (citation omitted) (emphasis added). Indeed, the Kraus court recognized that:
At the time of the constitutional convention in Illinois, [that is, 1970,] three states other than New York had established pension provisions in their constitutions: Alaska, Hawai`i, and Michigan. What is significant about these provisions, besides the reference to funding in the Michigan provision, is that all three refer to "accrued" benefits as being within the scope of protection, in significant contrast to the New York provision.

Id. (footnotes omitted) (emphases added).[1] Although the majority states that "Kraus was proven inconsistent by subsequent case law from Alaska determining that the term `accrued benefits' does not mandate the provision be interpreted in `significant contrast' with the New York provision," majority op. at ___, 162 P.3d at 747-48, I believe that "[t]he clearly expressed intentions of the framers of [our c]onstitution must control over any discordant interpretation from a sister state[, i.e., in this case, Alaska]." McNamee v. State, 173 Ill.2d 433, 220 Ill.Dec. 147, 153, 672 N.E.2d 1159, 1165 (1996). Consequently, unlike the majority, I would not rely on New York case law without limitation. Rather, I believe that New York case law should be accorded some weight to the extent that it is applicable to "accrued benefits" inasmuch as article XVI, section 2 refers to "accrued benefits" and not benefits in general as being within the scope of protection.
The majority also maintains that "Alaska's case law is instructive in interpreting [article XVI, section 2]." Majority op. at ___, 162 P.3d at 741. Specifically, the majority relies on Hammond v. Hoffbeck, 627 P.2d 1052 (Alaska 1981), in support of its assertion that "the phrase `accrued rights' is synonymous with vested rights." Majority op. at ___, 162 P.3d at 741 (citing Hammond, 627 P.2d at 1055 n. 4) (emphasis and footnote omitted). It is unclear, however, how an explanation of "accrued rights," a phrase not contained in either article XII, section 7 of the. Alaska Constitution[2] or article XVI, section 2 of the Hawai`i Constitution, is "instructive." It appears that the Alaska Supreme Court has consistently ___ although mistakenly ___ referred to the phrase "accrued rights" as being found in article XII, section 7 of the Alaska Constitution. See Municipality of Anchorage v. Gallion, 944 P.2d 436, 441 n. 7 (Alaska 1997) (noting that "[t]he phrase `accrued rights' in article XII, section 7 of the Alaska Constitution *752 is synonymous with `vested rights") (citing Hoffbeck, 627 P.2d at 1055 n. 4); Sheffield v. Alaska Pub. Employees' Ass'n, Inc., 732 P.2d 1083, 1085 n. 7 (Alaska 1987) (same). Consequently, given the Alaska Supreme Court's consistent and mistaken reference to a phrase not even contained in its constitution, i.e., "accrued rights" (as opposed to the actual phrase "accrued benefits"), Alaska's case law is hardly instructive, especially in light of the fact that the clearly expressed intentions of the framers of Hawaii's constitution must control. See McNamee, 220 Ill.Dec. at 153, 672 N.E.2d at 1165.
The majority also relies on Gallion in support of its assertion that the ERS "was weakened by Act 100 and could be adversely affected in the future." Majority op. at ___, 162 P.3d at 743. Such an assertion, however, is speculative and does not address the issue whether the accrued benefits were diminished or impaired. Indeed, even assuming arguendo that Act 100 "negatively contributed to the large unfunded actuarial liability of the ERS, . . . stripped the ERS of investment opportunities, and . . . prevented the ERS from establishing a rainy day fund for the years of poor investment returns," majority op. at ___, 162 P.3d at 743 (internal quotation marks omitted), the majority does not point to anything in the record to indicate that an employee's accrued benefits have been reduced as a result of Act 100. See Chun, 61 Haw. at 606, 607 P.2d at 421 (concluding that article XVI, section 2 "was meant to protect an employee from a reduction in accrued benefits").
Relying on California case law, namely, Valdes v. Cory, 139 Cal.App.3d 773, 189 Cal. Rptr. 212 (1983), the majority advances the proposition that "impairment to the source of the benefits constitute[s] a constitutional impairment of the employees' vested rights." Majority op. at ___, 162 P.3d at 744 (citation omitted). Valdes, however, is distinguishable from the instant case inasmuch as the petitioners in Valdes, who were members of the Public Employees' Retirement System (PERS), contended that certain legislation suspending periodic state funding of the system constituted an "impairment of contractual relationships between employees who are members of PERS and their public employers in violation of article 1, section 9, of the California Constitution[[3]] and article 1, section 10, clause 1 of the United States Constitution."[4] 189 Cal.Rptr. at 220 (emphases added). The ERS trustees in this case did not allege a claim of impairment of contractual obligations in violation of article 1, section 10, clause 1 of the United States Constitution, commonly referred to as the Contract Clause of the United States Constitution. Moreover, as previously stated, the "contractual relationship" referred to in article XVI, section 2 of the Hawai`i Constitution is between the system and its members, not between the State/Counties, i.e., the public employers, and the members of the system. Indeed, article XVI, section 2 provides in relevant part that "[m]embership in any employees' retirement system of the State or any political subdivision thereof shall be a contractual relationship[.]" (Emphases added.) The New York Court of Appeals has held that New York's similar provision, which states that "membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship," N.Y. Const. art. V, § 7 (emphases added), "establishes a contractual relationship between the employee and the retirement system in which benefits cannot be diminished or impaired." McDermott v. Regan, 82 N.Y.2d 354, 604 N.Y.S.2d 890, 624 N.E.2d 985, 987 (1993) (emphasis added). Consequently, it is the impairment of the accrued benefits of the contractual relationship between the employee and the retirement system, not the impairment of contractual relationships between employees and their public employers, that is protected under article XVI, section 2 of the Hawai`i Constitution. Accordingly, Valdes, in my view, is inapposite to the instant case.
*753 In addition to relying on inapposite case law, the majority does not focus on the scope of protection provided in article XVI, section 2, which states that the "accrued benefits" "shall not be diminished or impaired." Rather, the majority states throughout its analysis that (1) the Hawai`i legislature "is restricted by article XVI, section 2 from diminishing or impairing retirement funds," majority op. at ___, 162 P.3d at 728, (2) the "source[s] of the funds" were impaired, majority op. at ___, 162 P.3d at 741, (3) "the $346.9 million reduction in employer contributions unconstitutionally impaired the pension system[,]" majority op. at ___, 162 P.3d at 746 (footnote omitted), and (4) such "impairment to the source of the benefits constituted a constitutional impairment of the employees' vested rights," majority op. at ___, 162 P.3d at 744. Consequently, the impairment discussed by the majority is conspicuously outside the scope of protection provided in article XVI, section 2.
It should also be pointed out that the majority's characterization of Act 100 is totally inaccurate. Specifically, the majority maintains that "actions tantamount to removing funds from the ERS would constitute a violation of our constitution." Majority op. at ___, 162 P.3d at 741 (footnote omitted) (emphasis added). Although the majority attempts to qualify its characterization of Act 100 by including the word "tantamount," the majority is essentially creating the illusion that Act 100 enabled the State and county employers to remove funds from the ERS. However, as previously stated, Act 100 retroactively reduced the amounts the State and county employers contributed to the ERS in fiscal years 1997 and 1998 by crediting actuarial investment earnings in excess of ten percent of the actuarial investment yield rate toward those contributions. In other words, a crediting of earnings for contributions is not "tantamount" to an outright removal of funds.
Based on my reading of article XVI, section 2 of the Hawai`i Constitution, the debates of the 1950 Constitutional Convention pertaining to article XVI, section 2, the Committee of the Whole's Report, and my interpretation of New York case law, I would conclude that necessarily implied in article XVI, section 2 is the protection of the sources of funds needed to maintain the actuarial soundness and/or actuarial integrity of the system with respect to its members' accrued benefits. I would further conclude that the protection afforded by article XVI, section 2 is more limited than that afforded by article V, section 7 of the New York Constitution inasmuch as our provision indicates that the "accrued benefits," rather than "benefits," "shall not be diminished or impaired." In my view, such an interpretation recognizes the delegates' concerns regarding the right of current government employees to receive the benefits attributable to past services and the "preserv[ation]" of such benefits, that is, accrued benefits. My interpretation likewise recognizes the delegates' disinclination to unduly interfere with and/or limit the legislature's powers to make general changes to the system.
In applying the foregoing standard to the facts of the instant case, Act 100 did not constitute "a plain, clear[,] and manifest violation" of article XVI, section 2. The record reveals that the ERS's own actuary concluded that, as of June 30, 2001, the ERS was "actuarially sound," and, on June 30, 2002, concluded that "the present assets plus future required contributions will be sufficient to provide the benefits specified in the law[.]" (Emphasis added.) The ERS trustees do not point to anything in the record to suggest otherwise. In other words, the ERS trustees have not shown that accrued benefits have been "diminished or impaired."
Furthermore, the majority does not point to anything in the record to indicate that the sources of funds needed to maintain the actuarial soundness and/or actuarial integrity of the system with respect to the accrued benefits have been adversely affected by Act 100. Rather, as previously stated, the majority merely asserts that, even "assuming, arguendo, the ERS is actuarially sound, it was weakened by Act 100 and could be adversely affected in the future." Majority op. at ___, 162 P.3d at 743 (emphasis added). However, such an assertion is purely speculative. In fact, in holding that the Kaho`ohanohano plaintiffs lacked standing, the majority observed *754 that the Kaho`ohanohano plaintiffs were not "able to show any `immediate threat that the pension fund will become insolvent.'" Majority op. at ___, 162 P.3d at 715 (citation omitted).
The majority additionally states that, "through Act 100, the legislature retroactively divested the ERS of $346.9 million worth of employer contributions for 1997, 1998, and 1999. This divestment related to the past services of ERS members during 1997, 1998, and 1999." Majority op. at ___, 162 P.3d at 736 (some emphases in original and some added) (citation and footnote omitted). The majority then concludes that "[i]t would be inconsistent with the delegates' statements and the Committee of the Whole report to conclude that the delegates intended to afford legislative flexibility to the extent that the legislature could ultimately diminish or impair the benefits already accrued and contractually guaranteed." Majority op. at ___, 162 P.3d at 736 (emphasis omitted). First, the majority mischaracterizes the retroactive reduction of the state and county employers' contributions as a "divestment." See supra discussion. Second, the majority then characterizes this "divestment" as "relat[ing] to past services of ERS members during 1997, 1998, and 1999" to create the notion that the retroactive reduction of employer-contributions for past services somehow equates to a reduction in accrued benefits. There is nothing in the record that demonstrates that the reduced contributions for those years in any way diminished or impaired the accrued benefits of the ERS members. Finally, having concluded that the Kaho`ohanohano plaintiffs lack standing to pursue their claims in the instant matter, the majority determined that the Kaho`ohanohano plaintiffs, i.e., the members of the ERS, had failed to allege any actual or threatened injuries resulting from the passage of Act 100. Accordingly, it cannot now be said that the members' benefits attributable to past services were reduced as a result of Act 100.
Based on the foregoing, I would conclude that the ERS trustees did not carry their "burden of showing unconstitutionality beyond a reasonable doubt." Watland, 104 Hawai`i at 133, 85 P.3d at 1084 (citation omitted); see Anderson, 56 Haw. at 574, 545 P.2d at 1181 (stating that the presumption "is in favor of constitutionality, and all doubts must be resolved in favor of the act") (internal quotation marks and citation omitted). Accordingly, I would hold that the circuit court did not err in granting summary judgment in favor of the State.
NOTES
[1] Pursuant to Hawai`i Rules of Appellate Procedure (HRAP) Rule 43(c)(1), Henry F. Beerman, Alton Kuioka, and Georgina Kawamura, the current trustees of the Employees' Retirement System, have been substituted for Richard L. Humphreys, Neal K. Kanda, and Stanley T. Shiraki, respectively, the Trustees at the time this case was decided by the first circuit court.
[2] The Honorable Gary W.B. Chang presided.
[3] Article XVI, section 2 of the Hawai`i Constitution states, "Membership in any employees' retirement system of the State or any political subdivision thereof shall be a contractual relationship, the accrued benefits of which shall not be diminished or impaired."
[4] HRS § 88-123, entitled "Amount of annual contributions by the State and counties," provided that the State's and counties' contributions toward the pension accumulation fund shall be determined, in pertinent part,

by allocating the sum of the normal cost and the accrued liability contribution for (1) police officers . . ., and (2) all other employees in the same proportion as the aggregate annual compensation of each group employed by the State and by each county, respectively, as of March 31 of the valuation year.
[5] HRS § 88-114 (Supp.2006) defines "Pension Accumulation Fund." See infra note 6.
[6] In Chun v. Board of Trustees of Employees' Retirement System of the State of Hawaii, 92 Hawai`i 432, 440, 992 P.2d 127, 135 (2000), this court stated that "[w]here a party may incur an administrative burden as a result of an award of attorney's fees out of a common fund, that party may have standing to challenge and criticize the award of attorney's fees." (Citing Commonwealth of Kentucky Revenue Cabinet v. St. Ledger, 955 S.W.2d 539, 542 (Ky.Ct.App.1997); United Cable Television of Baltimore Ltd. P'ship v. Burch, 354 Md. 658, 732 A.2d 887, 902 (1999).). It was concluded that because the trustees of the ERS and the ERS "would incur a greater administrative burden" if the circuit court granted plaintiffs' counsel's motion "for an award of a percentage of the future payments of the increase in retirement benefits" to the plaintiffs, that "potential administrative burden . . . [gave] the [trustees] and the ERS an interest in the fund" and, therefore, "the [trustees] and the ERS had standing to challenge and criticize the award of attorney's fees" to the plaintiffs. Id. at 440-41, 992 P.2d at 135-36. As discussed in more detail, infra, it would be inconsistent in light of Chun to deny Trustees standing where their administrative interest in maintaining the viability and integrity of the retirement system is at stake.
[7] HRS § 88-114 defines the "Pension Accumulation Fund" as "the fund in which shall be accumulated all contributions made by the State and any county and all income from investments and from which shall be paid all benefits, including the bonus authorized under section 88-11, and other than those benefits which are specifically payable from other funds."
[8] HRS § 88-123 refers to the contributions to be made by the State and counties. See supra note 3.
[9] It appears that only Kaua`i County joined in the State's motion for summary judgment which is the subject of this appeal so it is unclear whether the other Counties are proper Appellees. However, the Counties essentially raise the same arguments in their answering briefs as the State does. In their cross-appeals, the Counties argue that the court erred by not granting the Counties summary judgment when it entered judgment in favor of the State. Accordingly, the appeals of the Counties are subject to the same disposition as that rendered against the State.
[10] HRS § 88-47 (Supp.2002) defined Class C employees as follows:

(3) Except for members described in paragraph (1), class C shall consist of all employees in positions covered by Title II of the Social Security Act who:
(A) First enter service after June 30, 1984;
(B) Reenter service after June 30, 1984, without vested benefit status as provided in section 88-96(b);
(C) Make the election to become a class C member as provided in part VII; or
(D) Are former class C retirants who return to service requiring the retirant's active membership[.]
[11] HRS § 88-281(a) (Supp.2006) provides:

A member who has ten years of credited service and has attained age sixty-two, or a member with thirty years credited service who has attained the age of fifty-five, shall become eligible to receive a retirement allowance after the member has terminated service.
[12] Pursuant to HRS 88-272, "credited services" includes:

(1) Service by an employee rendered since becoming a member;
(2) Service credited under part II as a class A or class B member for members who make the election described in section 88-271(a);
(3) Service for members who return to service in the manner described in section 88-271(b);
(4) Service in the armed forces as provided by subpart E of part II; provided that the service shall be credited at no cost upon certification by the system;
(5) Mandatory maternity leave as provided in part II; provided that such service shall be credited at no cost upon certification by the system;
(6) Service rendered prior to becoming a class C member as described in section 88-51 that is not included in paragraphs (1) to (5); provided that the service shall be credited at no cost. Upon certification by the system, that service shall be credited at the rate of one month of service credit for each month of service rendered following the return to membership; and
(7) Unused sick leave as provided in section 88-63; provided that any additional service credit shall not be used in determining eligibility for retirement or for any other purpose as a class C member.
[13] The State argues Dombrowski is distinguishable because (1) "Plaintiffs are not seeking mandamus relief (having filed this lawsuit close to three years after the effective date of Act 100 and after Act 100 has already been implemented)"; (2) "there was a specific charter provision mandating the city council to set up an actuarially sound pension and retirement system covering all officers and employees of the City" and "no such provision exists here";(3) Dombrowski did not involve a situation where the ERS law, for over 70 years, "allowed for the correction or adjustment of the public employers' contributions in a single subsequent year"; and (4) "Plaintiffs did not submit any admissible evidence showing that the ERS is actuarially unsound or was made unsound by Act 100."

Although Dombrowski is somewhat factually similar to the case at hand in that a city employee who was not yet eligible for retirement sued to compel the city to make necessary appropriations to the municipal retirement system, the standing analysis employed by that court was very different than the analysis required here as noted above.
[14] Part VII governs retirement for class C public officers and employees.
[15] Trustees' complaint reiterates certain foundational matters discussed supra with respect to HRS chapter 88.

BACKGROUND
. . . .
14. Pursuant to [HRS c]hapter 88, [Trustees] hold[ ] all funds of the system, and any and all interest and earning thereon, for the "exclusive use and benefit of the system and for the members of the system. . . ." [(Quoting HRS § 88-127.).]
15. Pursuant to [HRS c]hapter 88, [Trustees] ha[ve] the authority and discretion to invest and reinvest the funds as authorized by [c]hapter 88.
16. Pursuant to [HRS c]hapter 88, [Trustees are] vested with the general administration and responsibility for the proper operation of the ERS.
17. Pursuant to [HRS] § 88-122, [Trustees] engage[ ] an actuary. Based on regular and such mortality and other tables as are adopted by [Trustees], the actuary, on the basis of successive annual actuarial valuations, determines the [e]mployers' normal cost and accrued liability contributions for each fiscal year.
18. [Trustees are] required annually to allocate the interest and other earnings of the ERS to the funds of the system in accordance with [HRS] § 88-107.
19. Throughout most of the history of the ERS, the Hawaii Legislature has mandated that [Trustees] apply investment earnings in excess of a specified yield rate to offset the [e]mployers' contributions to the ERS funds. This practice is sometimes called "skimming."
20. When the earnings of high-return years are skimmed, however, the ERS loses the benefit of high yields that would offset market cycles in low-return years and is denied the benefit of full, ongoing [e]mployer funding.
(Emphases added.)
Thereafter, the complaint sets forth the relevant subsequent amendments to HRS chapter 88, by Act 276 and Act 327:
22. Act 276 of the 1994 Legislature variously amended [HRS c]hapter 88 to reduce the degree of skimming. Act 276 reduced the amount of investment earnings to be used to offset the [e]mployers' contributions and increased the amount of investment earnings to be retained by the ERS.
23. Act 327 of the 1997 Legislature amended [HRS] § 88-107 to provide that "[b]eginning in fiscal year 1997, one hundred percent of the investment earnings shall be deposited in the pension accumulation fund." Thus, Act 327 prohibited skimming.
24. Notwithstanding the provisions of Act 327 (1997), the ERS was not allowed to retain 100% of the investment earnings for the fiscal years 1997 and 1998. Act 100 of the 1999 Legislature retroactively reduced the amount of investment earnings that the ERS could retain, providing that "[i]n fiscal years 1997 and 1998, actuarial investment earnings in excess of a ten percent actuarial investment yield rate shall be applied to the amount contributed [by the employers.]" [ (Quoting 1999 Haw. Sess. L. Act 100, § 1 at 368.] )
(Emphases added.)
Trustees then alleged that Act 100 of the 1999 legislature violated article XVI, section 2 of the Hawai`i Constitution:
25. Act 100 was enacted to make additional funds available to [e]mployers. Section 3 of Act 100 states[,] "The savings realized by the State and the counties under this Part shall be utilized for the purpose of funding retroactive cost items for HGEA and UPW contracts expiring on or before June 30, 1999, and which have been approved under [HRS § ]889-10(b) . . . and other necessary items."
. . . .
28. By virtue of their constitutionally guaranteed contractual rights to accrued benefits "which shall not be diminished or impaired," and provisions of [HRS c]hapter 88, members of the ERS are entitled to an actuarially sound retirement system and to protection of funds held by or committed to the ERS. [(Quoting Haw. Const. art. XVI, § 2.)]
29. In retroactively diverting the 1997 and 1998 investment earnings from the ERS to the [e]mployers, the State unlawfully diminished and impaired the ERS funds; unlawfully risked impairment of the actuarial soundness of the ERS; unlawfully denied the members the protection of the funds to which they are entitled as a matter of law; and unlawfully interfered with and impaired the discretion of [Trustees] in the investment and reinvestment of the funds of the ERS.
(Emphases added.)
Accordingly, Trustees made two claims. Their first claim for declaratory relief stated:
FIRST CLAIM OF RELIEFDECLARATORY RELIEF
32. [Trustees] seek[ ] a declaratory judgment that Act 100 was and is in violation of [a]rticle XVI, [s]ection 2 of the Hawaii State Constitution.
33. [Trustees] seek[ ] a declaratory judgment that, in diverting investment earnings from the ERS, Act 100 unlawfully interfered with and impaired the discretion of the [Trustees] in the investment and reinvestment of the funds of the ERS.
(Emphases added.)
Their second claim for injunctive relief stated:
SECOND CLAIM OF RELIEFINJUNCTIVE RELIEF
. . . .
38. Part I, [s]ection 1 of Act 100 purports to prohibit future skimming. It provides that the application of excess actuarial investment earnings to offset employer contributions ". . . is a one-time only provision and no law shall be enacted to again require the employees' retirement system to apply actuarial investment earnings to offset the amount contributed [by the [e]mployers] under [HRS § ]88-123."
39. The foregoing assurance of [s]ection 1 is illusory. There is no guarantee that the State will abide by the above-stated restriction against skimming any more than it abided by the provisions of Act 327 (1997).
40. The ERS has suffered and will continue to suffer loss, injury, and damage attributable to the application of excess actuarial investment earnings as an offset against [e]mployer contributions by Act 100. [Trustees] is entitled to injunctive relief because there is no adequate remedy available at law and no other adequate remedy available in equity.
41. The investment earnings of high yield years are needed to offset, in whole or in part, the investment experience of low-return years. Full, ongoing [e]mployer funding, undiminished by skimming, is needed to assure stability and operation of the ERS on an actuarially sound basis.
42. When all or any portion of the ERS' investment earnings are applied as an offset against [e]mployer contributions, the ERS is deprived of the stability and security intended by the Hawaii State Constitution and Hawaii law.
43. A renewed pattern of legislative skimming enabling the [e]mployers to apply all or any portion of the ERS' investment earnings as an offset against their periodic contributions will result in irreparable injury to the ERS and unlawful impairment of the contractual rights of the members.
44. Accordingly, [Trustees] seek[ ] injunctive relief enjoining the State and its officers and agents from any further skimming the [sic] ERS' investment earnings and from taking any other further action that (a) will diminish, impair or otherwise obligate the ERS' actuarial investment earnings; or (b) will reduce the [e]mployers' periodic contributions as determined by [Trustees'] actuary in accordance with [c]hapter 88 and sound actuarial practice; or (c) otherwise will impair the contractual rights of the members.
(Emphases added.)
As to their first claim, Trustees requested several declarations of law. Trustees
pray[ed] that the [c]ourt enter an order, decree and judgment in favor of [Trustees] as follows:
A. Declaring that Act 100 of the 1999 State of Hawaii Legislature was and is in violation of [a]rticle XVI, section 2 of the Hawaii State Constitution;
B. Declaring that Act 100, in diverting actuarial investment earnings from the ERS, unlawfully interfered with and impaired the discretion of [Trustees] in the investment and reinvestment of the funds of the ERS.
C. Declaring that, under [a]rticle XVI, [s]ection 2 of the Hawaii State Constitution and applicable law, the members of the ERS are entitled to an actuarially sound retirement system, such that the system may be operated by [Trustees] pursuant to the determinations of an actuary engaged by [Trustees] and is funded annually at a level not lower than the normal cost of the plan plus the amount of actuarially determined accrued liability contributions;
D. Declaring that, under [a]rticle XVI, section 2 of the Hawaii Constitution and applicable law, an actuary engaged by the [Trustees], acting on regular interest and such mortality and other tables as may be adopted by [Trustees], shall determine the [e]mployers' normal cost and accrued liability contributions for each fiscal year without interference or impairment on the part of the State;
E. Declaring that, under [a]rticle XVI, section 2 of the Hawaii Constitution and applicable law, the State and its officers and agents are prohibited from skimming the ERS' investment earnings and from taking any other or further action that (a) will diminish, impair, or otherwise obligate the ERS' actuarial investment earnings; or (b) will reduce the [e]mployers' periodic contributions as determined by [Trustees'] actuary in accordance with [c]hapter 88 and sound actuarial practice; or (c) otherwise will impair the contractual rights of the members[.]
(Emphasis added.)
As to their second claim, Trustees requested a permanent injunction against diminishment or impairment of ERS obligations by way of "skimming" and by the improper reduction of employer contributions:
F. Enjoining the State and its officers and agents from any further skimming the ERS' investment earnings and from taking any other or further action that (a) will diminish, impair, or otherwise obligate the ERS' actuarial investment earnings; or (b) will reduce the [e]mployers' periodic contributions as determined by [Trustee's] actuary in accordance with [c]hapter 88 and sound actuarial practice; or (c) otherwise will impair the contractual rights of the members;
(Some emphases in original and some added.)
[16] As we have said previously, "[a]n organization . . . has standing to sue for injury to its own interests, separate from any injury to its members, inasmuch as standing may be established in an individual or representative capacity." Hawaii Medical Assoc., 113 Hawai`i at 100, 148 P.3d at 1202 (citation omitted) (emphases added). To make clear, regardless of the fact that Plaintiffs lack standing, Trustees have standing to challenge Act 100 in their capacities as fiduciaries. See discussion supra and infra.
[17] Under Hawai`i Rules of Evidence (HRE) Rule 201 (1993), judicial notice may be taken of facts "either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." HRE 201 also provides that "[a] court may take judicial notice, whether requested or not," "at any stage of the proceeding."
[18] The ERS describes "unfunded accrued liability" as "the difference between the total present value of future benefits and the actuarial present value of future normal costs" and that "the unfunded actuarial accrued liability (UAAL) is the excess of the actuarial accrued liability over the actuarial value of assets." Employees' Retirement System of the State of Hawai`i, Comprehensive Annual Financial Report For the Fiscal Year Ended June 30, 2004 at 82 (Dec. 13, 2004). The ERS explains that "[t]he percentage computed by dividing the actuarial value of net assets available for benefits by the actuarial accrued liability is generally referred to as the `funded ratio.' This ratio provides an indication of the funded status of the ERS on a going-concern basis and generally the greater the percentage, the stronger the pension trust." Id. at 10.
[19] It has been held that the general rule that an appellate court is limited to the records and facts in the lower court's proceedings, "is subject to the right of an appellate court in a proper case to take judicial notice of new developments not considered by the lower court." Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 151 (3d Cir. 1973) (citing 31 C.J.S., Evidence § 13, at 842 (1964)); see also Bryant v. Carleson, 444 F.2d 353, 357-58 (9th Cir.1971) (taking judicial notice of developments since appeal, including, inter alia, relevant administrative action and a decision of a state court in a related matter); cf. Scherer v. Equitable Life Assurance Soc'y of U.S., 347 F.3d 394, 402 (2d Cir.2003) (stating that "it is appropriate for this court to affirm the district court by taking judicial notice of state court records which leave no doubt as to the correctness of the district court's determination" (citations omitted)); Rothenberg v. Sec. Mgmt. Co., 667 F.2d 958, 961 n. 8 (11th Cir.1982) (citing subsequent development in related state case and explaining that "[w]e are . . . free to take judicial notice of subsequent developments in cases that are a matter of public record and are relevant to the appeal").

This case is a "proper case" for judicial notice of subsequent events inasmuch as the issue of standing is only raised on appeal, and the parties were unable to develop the record regarding the ERS' standing. Hence, the ERS reports of 2002 to 2005 may be judicially noticed.
[20] The same report also reflects that the UAAL of the ERS has increased from $733 million to over $4 billion from 1997 to 2005, approximately a five-and-a-half times increase in unfunded liability in a span of eight years. ERS Financial Report for the Fiscal Year Ended June 30, 2005 at 97 (Dec. 29, 2005).
[21] It was noted that despite its standing to bring suit against the defendants in Mottl, the BOR neither brought suit nor moved to intervene. 95 Hawai`i at 397, 23 P.3d at 732 (Acoba, J., concurring).
[22] HRS § 632-1, which authorizes actions for declaratory judgment, provides in pertinent part as follows:

In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed for; provided that declaratory relief may not be obtained in any district court. . . .
Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.
[23] The public interest exception has sometimes been connected with the "capable of repetition, yet evading review" exception. They are, however, two separate and distinct exceptions. See Yogi, 101 Hawai`i at 58, 62 P.3d at 201 (Acoba, J., concurring) (stating that, "[a]t this stage in our jurisprudence, our appellate courts have merged two, sometimes overlapping, yet distinct exceptions to the mootness doctrine: the `public interest' exception and the `capable of repetition, yet evading review' exception"); see also Avis K. Poai, Recent Developments: Hawaii's Justiciability Doctrine, 26 U. Haw. L.Rev. 537, 548-52 (Summer 2004) (observing that the "public interest" and "capable of repetition, yet evading review" exceptions are often merged, but should not be as they are two distinct exceptions that require different considerations).

There is an exception to the mootness doctrine "[i]n cases involving a legal issue which is capable of repetition, yet evading review[.]" In re Thomas, 73 Haw. 223, 226, 832 P.2d 253, 255 (1992) (citation omitted). "The phrase, `capable of repetition, yet evading review,' means that `a court will not dismiss a case on the grounds of mootness where a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit[,]'" id. at 226-27, 832 P.2d at 255 (quoting Life of the Land v. Burns, 59 Haw. 244, 251, 580 P.2d 405, 409-10 (1978)) (citation omitted).
[24] Plainly then, the dissent's contention that the "impairment discussed by the majority is conspicuously outside the scope of the protection in article, XVI, section 2[,]" dissenting opinion at ___, 162 P.3d at 753, is without merit as the delegates intended to provide constitutional protection of the system itself in order to "guarantee [the legislature would] put up every bit of money necessary in the future to make good these proposed benefits set forth in the present law[,]" Proceedings of the Constitutional Convention of Hawai`i of 1950, Vol. 2 at 495-96 (emphasis added). Further, the dissent fails to articulate what it believes the scope of article XVI, section 2 actually encompasses and, in argument, only quotes the constitutional provision providing that "accrued benefits" "shall not be diminished or impaired[.]" Dissenting opinion at ___, 162 P.3d at 753.
[25] The dissent argues that this opinion "mischaracterizes the retroactive reduction of the state and county employers' contributions as a `divestment[,]'" dissenting opinion at ___, 162 P.3d at 754, however it offers no explanation as to why a $346.9 million removal from the ERS fund is not a divestment. As the delegates noted, the constitutional pension protection "applies to all those that are now members of the system. They have made their contributions . . . [a]nd it's just such a reduction or impairment of those benefits that the employees should be concerned with." Proceedings of the Constitutional Convention of Hawai`i of 1950, Vol. 2, at 495.

Act 100's retroactive reduction constitutes "impairment of those benefits the employees should be concerned with" and a violation that article XVI, section 2 was designed to guard against. Further, the dissent's contention that "[t]here is nothing in the record that demonstrates the reduced contributions for those years in any way diminished or impaired the accrued benefits of the ERS members[,]" dissenting opinion at ___, 162 P.3d at 754, is simply incorrect for the reasons noted throughout this opinion and most significantly because of the unnecessary risk placed on the system and the investment opportunities lost by the retroactive removal of millions of dollars.
[26] It should be noted that the dissent posits a "distinction between the `system' itself and the constitutional protection of that system[,]" and contends that the "majority's view blurs [that] distinction." Dissenting opinion at ___, 162 P.3d at 750. However, the dissent acknowledges that the delegates "did not express an intent to depart from following the New York system[.]" Id. (emphasis in original). The dissent draws the illogical conclusion that because part of Delegate Ohrt's preceding statement manifested the delegate's intent to follow the New York system, this necessarily meant that "the delegates ultimately refrained from adopting New York's constitutional protection of the system." Id. (emphasis in original).

The dissent's contention is plainly contradicted by Delegate Ohrt's complete statement which again states, "I've seen a great deal of work here on the Convention floor. New York State has taken the leadership in this  in pensions, trying to save the taxpayers some money. This was done in 1938 in New York. It's functioning well and we think that we are entitled to the same protection [,]" 1950 Proceedings of the Constitutional Convention of Hawai`i, Vol. 1 at 497 (emphasis added), namely, constitutional protection. Thus, the dissent's contention is plainly wrong.
[27] It should be noted that the dissent contends that "the delegates ultimately refrained from adopting New York's constitutional protection of the system by rejecting the purported New York-based provision (i.e., Proposal No. 129) to a significant extent by inserting the word `accrued' before the word `benefits.'" Dissenting opinion at ___, 162 P.3d at 751 (emphasis in original). However, as discussed supra, Delegate Anthony related that the purpose of adding the word "accrued" before the word "benefits" was "to preserve the accrued benefits but still leave the legislature free as to the future." 1950 Proceedings of the Constitutional Convention of Hawai`i, Vol. 1 at 499.

Likewise, the New York provision reflects a similar intention. As Delegate Mau related during the proceedings, the New York provision was intended to "protect taxpayers because it does not attempt to force them to continue unsound costly systems which never would have been approved if the real cost had been known" but that "[o]n the other hand, it does give members of such system contractual rights to reasonable accrued benefits." Id. at 497 (emphasis added). In other words, similar to article XVI, section 2, the New York provision allows the system to be discontinued or otherwise modified with respect to future benefits, but protects members'"contractual rights to reasonable accrued benefits." Id. Thus, contrary to the dissent's contention, the addition of the word "accrued" in article XVI, section 2 is not a "significant[] modifi[cation]" or a "rejecti[on]" of the New York provision and cannot be a basis upon which to limit the application of New York case law inasmuch as both article XVI and section 2 contemplated the same scope of protection. See dissenting opinion at ___, 162 P.3d at 751 (stating that the relevance of New York case law should be limited "to the extent that it is applicable to `accrued benefits' inasmuch as article XVI, section 2 refers to `accrued benefits' and not benefits in general as being within the scope of protection" (emphases in original)).
[28] The dissent appears to agree somewhat with the New York courts where it concludes that "necessarily implied in article XVI, section 2 is the protection of the sources of funds needed to maintain the actuarial soundness and/or actuarial integrity of the system with respect to its members' accrued benefits." Dissenting opinion at ___, 162 P.3d at 753 (emphasis in original). It is unclear, however, why the dissent then concludes that a $346 million dollar divestment from the system does not violate our constitution.

The dissent, relying on Illinois case law, maintains that "`[t]he clearly expressed intentions of the framers of our constitution must control over any discordant interpretation from a sister state[.]'" Dissenting opinion at ___, 162 P.3d at 751 (brackets omitted) (quoting McNamee v. State, 173 Ill.2d 433, 220 Ill.Dec. 147, 153, 672 N.E.2d 1159, 1165 (1996)). As noted, our own framers' intent, as expressed in the Committee of the Whole reports, is consistent with this opinion. On the other hand, the dissent's citation to clearly discordant Illinois law ignores the convention history and the framers' intent.
[29] Contrary to the dissent's position that "the majority does not point to anything in the record to indicate . . . the actuarial soundness and/or actuarial integrity of the system with respect to accrued benefits have been adversely affected by Act 100[,]" dissenting opinion at ___, 162 P.3d at 753, the constitutional pension provision does not merely require a showing that the system is actuarially sound or that it has the ability to pay the benefits that are owed currently, but, as noted supra, the record is clear, it is the sources of the constitutionally protected benefits that have been diminished or impaired.
[30] It is puzzling how, as the dissent contends retroactively reducing the amounts State and county employers were legally obligated to contribute to the ERS based on the past services of its employees could not be tantamount to removing funds that should have been deposited with the ERS. Dissenting opinion at ___, 162 P.3d at 753. The dissent rationalizes that "a crediting of earnings for contributions is not `tantamount' to an outright removal of funds." Id. at ___, 162 P.3d at 753 (emphases omitted). However, whether characterized as a retroactive "crediting of earnings" or an "outright removal[,]" the same unconstitutional result is achieved: the ERS lost $346.9 million that it would otherwise have had at its disposal. It is not an illusion that in 1999, Act 100 retroactively divested the ERS of $346.9 million of employer contributions that State and county employers were required to pay, but had not yet paid for 1997, 1998, and 1999, and which were attributable to the past services of State and county employees for 1997, 1998, and 1999. See supra. Thus, the dissent is incorrect in claiming that this "characterization of Act 100 is totally inaccurate[,]" dissenting opinion at ___, 162 P.3d at 753, and the dissent does not indicate any authority for such an assertion.
[31] The dissent states that its opinion is, in part, based on its "interpretation of New York case law." Dissenting opinion at ___, 162 P.3d at 753. However, New York case law is plainly adverse to the dissent's position inasmuch as it protects the sources of the retirement benefits, or the system itself.
[32] The dissent maintains that "Alaska's case law is hardly instructive" because the Alaska Supreme Court "has  consistently although mistakenly  referred to the phrase `accrued rights' as being found" in Alaska's constitutional pension provision but the "phrase [is] not contained in either [the Alaska or Hawai'i provisions.]" Dissenting opinion at ___, 162 P.3d at 751. First, the Alaska Supreme Court was not "consistently . . . mistaken" as the dissent alleges, but found that an "accrued benefit" constituted a "right." Hammond, 627 P.2d at 1055 ("Recognizing that there is a division of authority on the question of whether an employee's rights to benefits under systems like PERS vest on employment and enrollment in the system or only at the time when an employee becomes eligible to receive those benefits" and that it was "previously held that the phrase `accrued rights' is synonymous with `vested' rights" (citation omitted)). Hence, it is the dissent that is "mistaken" in its characterization of Alaska law.

It is also incorrect for the dissent to characterize Alaska case law, interpreting an almost identical constitutional pension provision as "hardly instructive" especially in light of the dissent's continued assertion that "the clearly expressed intentions of the framers of Hawaii's constitution must control." Dissenting opinion at ___, 162 P.3d at 752. Plainly, the expressed intentions of the Hawai`i framers must guide this court and as noted supra, the Committee of the Whole Reports support the result here as the framers manifestly intended to protect the retirement system itself from diminishment or impairment.
[33] The court in Hammond went on to conclude that "the fact that rights in PERS vest on employment does not preclude modifications to the system; that fact does, however require that any changes in the system that operate to a given employee's disadvantage must be offset by comparable new advantages." 627 P.2d at 1057.
[34] The dissent maintains that "Valdes . . . is distinguishable from the instant case inasmuch as the petitioners in Valdes" argued that "certain legislation suspending periodic state funding of the system constituted an `impairment of contractual relationships between employees who are members of PERS and their public employers in violation of article 1, section 9, of the California Constitution and article 1, section 10, clause 1 of the United States Constitution[,]" dissenting opinion at ___, 162 P.3d at 752 (citing Valdes, 189 Cal.Rptr. at 220 (emphases added)), and because there is no such contracts clause violation alleged here "Valdes . . . is inapposite to the instant case[,]" id. at ___, 162 P.3d at 752. As noted, California does not have the added constitutional pension provision that Hawai`i does.

However California courts have nevertheless provided protection relying on the "contracts clauses" of the California state and U.S. constitutions. As one commentator noted, "when considering the constitutional protection afforded public pensions as contracts against borrowing or underfunding, the starting point is the protections source."
The Contract Clause operates in every state as the basic protection for those jurisdictions which confer contract status upon public pension system membership or benefits or both. A second source of protection can be found in the constitution of any state which carries a mirroring provision. A third source exists in the constitutions of Alaska, Hawai`i, Illinois, Michigan, and New York.
Because the Contract Clause directly limits state power to impair contracts, the existence of a mirroring state constitutional provision becomes superfluous where no further protection was intended.
Darryl B. Simko, Of Pensions, State Constitutional Contract Protection, and Fiscal Constraint, 69 Temp. L. Rev 1059, 1077 (1996) (emphases added).
In discussing states with a specific constitutional protection prohibiting the impairment of benefits, such as our own, Simko notes that "the structure may suggest the contract protection created could be greater than the impairment-of-benefits protection. The specific reference to the protection of benefits is secondary to the statement that public pension system membership gives rise to contract protections." Id. at 1078.
[35] The United States Constitution, Article I, section 10 states that, "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."
[36] The dissent also contends that Valdes is distinguishable because "the `contractual relationship' referred to in article XVI, section 2 of the Hawai`i Constitution is between the system and its members, not between the State/Counties, i.e. the public employers, and the members of the system." Dissenting opinion at ___, 162 P.3d at 752 (emphases omitted). The dissent's point is unclear here  it appears to argue that the Trustees would never have the capacity to bring an action regarding any legislative action violating article XVI, section 2. For the reasons noted throughout this opinion, including significantly, the Trustees' fiduciary duties to the system members and their capacity to sue and be sued, this is plainly not the case. Further, as noted in the convention history the delegates "fe[lt] strongly that there should be a contractual relationship . . . between the government" and the "employees" because "the government should in good faith keep [its] obligation with the employees of the territory." Proceedings of the Constitutional Convention of Hawai`i of 1950, Vol. 2, at 495. Thus, contrary to the dissent's position, it appears that our delegates did indeed intend to create constitutional obligations between "the government[,]" i.e., the city and county employers, and "the employees." Id.; see also supra.
[37] The Valdes court went on to discuss whether, despite the impairment, the act was nonetheless constitutional. Although this discussion is unnecessary in Hawai`i where impairment is constitutionally prohibited, the Valdes court concluded that the "[s]tate . . . failed to meet its burden of demonstrating that the impairment of petitioners' rights is warranted by an `emergency' serving to protect a `basic interest of society.'" 189 Cal.Rptr. at 226.
[38] Contrary to the dissent's contention, to reiterate, our extensive discussion of the relevant proceedings of the 1950 Constitutional Convention, in addition to the case law of New York, Alaska, and California, illuminates that the protection of the retirement system is necessarily encompassed by article XVI, section 2. See Dissenting opinion at ___, 162 P.3d at 753.
[39] Contrary to the dissent's position, the Trustees have carried their "burden of showing unconstitutionality beyond a reasonable doubt." Dissenting opinion at ___, 162 P.3d at 754 (internal quotation marks and citation omitted). For the reasons discussed in detail throughout this opinion, including the intent of the framers to create a constitutional pension provision that would protect the retirement system and create constitutional obligations between the public employers and their employees that could not be diminished or impaired, see supra, the retroactive reduction of $346.9 million impaired the system and constituted a "manifest" violation of the constitution.
[40] As such, the dissent's assertion that "the [Trustees] have not shown that accrued benefits have been `diminished or impaired[,]'" dissenting opinion at ___, 162 P.3d at 753, is contrary to the record and the evidence showing that Act 100 caused the system to be retroactively reduced by $346.9 million.
[41] We emphasize that this majority opinion plainly applied the rules of statutory construction reiterating that "a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt" and that "[t]he infraction should be plain, clear, manifest, and unmistakable." Watland, 104 Hawai`i at 133, 85 P.3d at 1084 (internal quotation marks, brackets, ellipses, and citations omitted). Furthermore, we concluded that "it is `plain, clear, manifest, and unmistakable[,]' id. at 133, 85 P.3d at 1084 (internal quotation marks, brackets, ellipses, and citations omitted), that the $346.9 million reduction in employer contributions unconstitutionally impaired the pension system." See supra. Thus, the dissent's assertion that "the majority's analysis in its entirety essentially disregards this court's well-established rules of constitutional construction, to wit, that, with the exception of statutes that classify on the basis of suspect categories, . . . every enactment of the legislature is presumptively constitutional, and that all doubts must be resolved in favor of the act" and that "the majority treats Act 100 as presumptively un constitutional and resolves all doubts against Act 100" is unsupported. Dissenting opinion at ___, 162 P.3d at 750 (internal quotation marks and citations omitted) (emphases and ellipses points in original).
[42] The State points out that there is no dispute that the ERS "is a qualified defined benefit pension plan under Section 401(a) of the Internal Revenue Code." "A `defined benefit' pension plan provides a definitely determinable `accrued benefit,' generally for the life of the employee, after retirement, the amount of which depends on the employee's service and pay history."
[43] The Illinois Constitution, article XIII, Section 5 reads, "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired."
[44] Quoting from the Illinois debates, the Illinois court pointed out that:

Benefits not being diminished really refers to this situation: If a police officer accepted employment under a provision where he was entitled to retire at two-thirds of his salary after twenty years of service, that could not be subsequently changed to say that he was entitled to only one-third of his salary after thirty years of service, or perhaps entitled to nothing. That is the thrust of the word "diminished." It was not intended to require 100 percent funding or 50 percent or 30 percent funding or get into any of those problems, aside from the very slim area where a court might judicially determine that imminent bankruptcy would really be important.
. . . .
Mr. President and fellow delegates, I agree with Delegate Kinney, that as I read section 16, it doesn't require the funding of any pensions, and therefore the whole question of funding is irrelevant to the issue of whether we should adopt the provision.
. . . .
I am voting yes in the hope that the points which Mr. Whalen has raised will be properly protected in the work of the Style and Drafting Committee and that there will be an affirmation that this does not direct or control funding. I vote yes.
McNamee, 220 Ill.Dec. at 151, 672 N.E.2d at 1163, 1164 (emphases in original). Unlike the delegates to the Illinois constitutional convention, the delegates to the 1950 Constitutional Convention of Hawai`i were especially concerned with the funding of the ERS because of the Territory's past lapses in funding ERS benefits. The delegates expressly intended that article XVI, section 2 act as a mechanism to provide a sound retirement system for state and county employees. See discussion supra.
[45] The Kosa court pointed to the following excerpt from the Michigan constitutional debates:

I would like to indicate that the words `accrued financial benefits' were used designedly, so that the contractual right of the employee would be limited to the deferred compensation embodied in any pension plan, and that we hope to avoid thereby a proliferation of litigation by individual participants in retirement systems talking about the general benefits structure, or something other than his specific right to receive benefits. It is not intended that an individual employee should, as a result of this language, be given the right to sue the employing unit to require the actuarial funding of past service benefits, or anything of that nature. What it is designed to do is to say that when his benefits come due, he's got a contractual right to receive them.
292 N.W.2d at 459 n. 21 (emphases added). The court also pointed out the following excerpt: "Then, he would not have a remedy of legally forcing the legislative body each year to set aside the appropriate amount, but when the money did come due this would be a contractual right for which he could sue[.]" Id.
[1] I note that the Illinois Court of Appeals has indicated that the Illinois convention debates "establish an intent to adopt the language and basic thrust of the New York constitutional provision[.]" Kraus, 28 Ill.Dec. at 700, 390 N.E.2d at 1290. Article XIII, section 5 of the Illinois Constitution provides:

Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired.
(Emphasis added.)
[2] Article XII, section 7 of the Alaska Constitution provides:

Membership in employee retirement systems of the State or its political subdivisions shall constitute a contractual relationship. Accrued benefits of these systems shall not be diminished or impaired.
(Emphasis added.)
[3] Article 1, section 9 of the California Constitution provides in relevant part that a "law impairing the obligation of contracts may not be passed."
[4] Article 1, section 10, clause 1 of the United States Constitution provides in relevant part that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]"